*1244
 
 OPINION
 

 Per Curiam:
 

 A jury convicted appellant Michael Damon Rippo of two counts of first-degree murder, one count of robbery, and one count of unauthorized use of a credit card. Rippo received two sentences of death for the first-degree murder convictions. Rippo raises numerous issues on appeal. We conclude that Rippo was fairly tried, convicted, and sentenced to death.
 

 FACTS
 

 On February 20, 1992, the apartment manager of the Katie Arms Apartment Complex in Las Vegas discovered the bodies of Denise Lizzi and Lauri Jacobson in Jacobson’s apartment. Officers from the Las Vegas Metropolitan Police Department (“LVMPD”) arrived at the scene and recovered a clothing iron and a hair dryer, from which the electrical cords had been removed, a black leather strip, a telephone cord, and two pieces
 
 *1245
 
 of black shoelace. They observed glass fragments scattered on the living room and kitchen floor areas.
 

 In April 1992, the LVMPD arrested Diana Hunt and charged her with the killing and robbery of Lizzi and Jacobson. As part of her plea agreement, Hunt agreed to testify at the trial of Michael Rippo. Hunt testified to the following:
 

 At the time of the murders, Hunt was Rippo’s girlfriend. On February 18, 1992, she and Rippo went to the Katie Arms Apartment Complex to meet Jacobson, who was home alone. Rippo and Jacobson injected themselves with morphine for recreational purposes. Shortly thereafter Lizzi arrived, and she and Jacobson went outside for approximately twenty minutes. While Jacobson and Lizzi were outside, Rippo closed the apartment curtains and the window and asked Hunt to give him a stun gun she had in her purse. Rippo then made a phone call.
 

 When Jacobson and Lizzi returned to the apartment, they went into the bathroom. Rippo brought Hunt a bottle of beer and told her that when Jacobson answered the phone, Hunt should hit Jacobson with the bottle so that Rippo could rob Lizzi. A few minutes later the phone rang, and Jacobson came out of the bathroom to answer it. Hunt hit Jacobson on the back of her head with the bottle causing Jacobson to fall to the floor. Rippo and Lizzi were yelling in the bathroom, and Hunt could hear tire stun gun being fired. Hunt witnessed Rippo wrestle Lizzi across the hall into a big closet. Hunt ran to the closet and observed Rippo sitting on top of Lizzi and stunning her with the stun gun. Hunt then went to the living room and helped Jacobson sit up. Rippo came out of the closet holding a knife which he had used to cut the cords from several appliances, told Jacobson to lie down, tied her hands and feet, and put a bandanna in her mouth.
 

 Hunt next saw Rippo in the closet with Lizzi. Rippo had tied Lizzi’s hands and feet. At this point, a friend of Jacobson’s approached the apartment, knocked on the door, and called out for Jacobson. Rippo put a gag in Lizzi’s mouth. Jacobson was still gagged and apparently unable to answer. After the friend left, Rippo began stunning Jacobson with the stun gun. He placed a cord or belt-type object through the ties on Jacobson’s feet and wrists, and dragged her across the floor to the closet. As Rippo dragged her, Jacobson appeared to be choking. Hunt began to vomit and next remembered hearing an odd noise coming from the closet. She observed Rippo with his knee in the small of Lizzi’s back, pulling on an object he had placed around her neck.
 

 When Hunt accused Rippo of choking the women, Rippo told her that he had only temporarily cut off their air supply, and that Hunt and Rippo had to leave before the two women woke up. Rippo wiped down the apartment with a rag before leaving.
 
 *1246
 
 While cleaning up, Rippo went into the closet and removed Lizzi’s boots and pants. He explained to Hunt that he needed to remove Lizzi’s pants because he had bled on them.
 

 Later that evening, Rippo called Hunt and told her to meet him at a friend’s shop. When Hunt arrived, Rippo was there with Thomas Simms, the owner of the shop, and another unidentified man. Rippo told Hunt that he had stolen a car for her and that she needed to obtain some paperwork on it. Hunt believed the car, a maroon Nissan, had belonged to Lizzi.
 

 The next day, on February 19, 1992, Hunt and Rippo purchased a pair of sunglasses using a gold Visa card. Rippo told Hunt that he had purchased an air compressor and tools on a Sears credit card that morning. Later that day, Hunt, who was scared of Rippo and wanted to “get away from him[,]” went through Rippo’s wallet in search of money. Hunt was unable to find any money, but she took a gold Visa card belonging to Denny Mason, Lizzi’s boyfriend, from Rippo’s wallet. Hunt did not know who Mason was. Around February 29, 1992, Rippo confronted Hunt. Hunt suggested to Rippo that they turn themselves in to the LVMPD, but Rippo refused, telling Hunt that he had returned to Jacobson’s apartment, cut the women’s throats, and jumped up and down on them.
 

 The medical examiner, Dr. Giles Sheldon Green, who performed autopsies on Lizzi and Jacobson, also testified at Rippo’s trial. Dr. Green testified that Lizzi had been found with a sock in her mouth, secured by a gag that encircled her head. The sock had been pushed back so far that part of it was underneath Lizzi’s tongue, blocking her airway. Pieces of cloth were found tied around each of her wrists. Dr. Green testified that Lizzi’s numerous injuries were consistent with manual and ligature strangulation.
 

 Dr. Green testified that Jacobson died from asphyxiation due to manual strangulation. Dr. Green found no traces of drugs in Jacobson’s system. Neither of the womens’ bodies revealed stun gun marks.
 

 Thomas Simms also testified at trial that Rippo arrived at his shop on February 18, 1992, with a burgundy Nissan. When Simms asked about the ownership of the car, Rippo responded that someone had died for it. Rippo gave Simms several music cassette tapes, many bearing the initials D.L., and an empty suitcase with Lauri Jacobson’s name tag. On February 21, 1992, Simms heard a news report that two women had been killed and that one of them was named Denise Lizzi. On February 26, 1992, Simms met Rippo in a parking lot to return a bottle of morphine that Rippo had left in Simms’ refrigerator. When Simms inquired
 
 *1247
 
 about the murders, Rippo admitted that he had “choked those two bitches to death” and that he had killed the first woman accidentally so he had to kill the other one.
 

 On September 15, 1993, Deputy District Attorneys John Lukens and Teresa Lowry accompanied two police officers in the execution of a search warrant on the home of Alice Starr. Starr had testified on the State’s behalf before the grand jury but subsequently was identified by Rippo as an alibi witness. Officer Roy Chandler, one of the two officers present at the scene, testified at an evidentiary hearing that Starr’s sister responded to their knock on the door, admitted the officers and the prosecutors, and told them that she and her two children were the only ones in the house. Starr, however, suddenly came out of the kitchen area. Surprised at Starr’s presence, the officers checked the residence for other individuals. The officers removed their guns from their holsters. Starr corroborated the officers’ version of the events, testifying that the officers did not draw their guns until she appeared from the kitchen.
 

 During the search, one of the officers found drugs and placed Starr under arrest. Lukens testified that he told Starr:
 

 I am concerned. When I was last here, you told me that your relationship with Mr. Rippo was as an acquaintance .... I don’t think you were honest with me. And if there was anything else that you weren’t honest in telling me the truth about, I’d like to give you a chance to tell me.
 

 Starr testified that Lukens did not threaten her, but stated, “[I]f [you’re] going to dangle on [Rippo’s] star, [you’re] going to go down like he is.” Upon a motion by the defense, the district court disqualified Lukens and Lowry as a result of their participation in the search and requested the district attorney’s office to transfer the case to different prosecutors.
 

 The jury found Rippo guilty of two counts of first-degree murder, and one count each of robbery and unauthorized use of a credit card. After the penalty hearing, the jury sentenced Rippo to death, finding six aggravating factors: (1) the murders were committed by a person under sentence of imprisonment; (2) the murders were committed by a person who was previously convicted of a felony involving the use or threat of violence to another person; (3) the murders were committed while the person was engaged in the commission of or an attempt to commit robbery; (4) the murders involved torture; (5) the murders were committed while the person was engaged in the commission of or an attempt to commit burglary; and (6) the murders were committed while the person was engaged in the commission of or an attempt to commit kidnapping.
 

 
 *1248
 

 DISCUSSION
 

 Disqualification of the trial judge
 

 During the trial, the parties became aware that District Judge Gerard Bongiovanni was the subject of a federal grand jury probe. The defense requested that Judge Bongiovanni recuse himself from Rippo’s trial because of the pending investigation. The defense argued that a potential conflict existed because the news media might pressure the judge, thereby making it “incumbent upon the Court to show how tough it can be and how it can be favorable to the State.”
 

 NCJC Canon 3(E) provides, in part:
 

 (1) A judge shall disqualify himself or herself in a proceeding in which the judge’s impartiality might reasonably be questioned, including but not limited to instances where:
 

 (a) the judge has a personal bias or prejudice concerning a party or a party’s lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding.
 

 See also
 
 NRS 1.230.
 

 A judge is presumed to be impartial, and the party asserting the challenge carries the burden of establishing sufficient factual grounds warranting disqualification. Hogan v. Warden, 112 Nev. 553, 559-60, 916 R2d 805, 809,
 
 cert.
 
 denied,.U.S., 117 S. Ct. 334 (1996) (citing Goldman v. Bryan, 104 Nev. 644, 649, 764 P.2d 1296, 1299 (1988)). Disqualification must be based on facts, rather than mere speculation. PETA v. Bobby Berosini, 111 Nev. 431, 437, 894 P.2d 337, 341 (1995);
 
 see also
 
 United States v. Cooley, 1 F.3d 985, 993 (10th Cir. 1993) (“Rumor, speculation, beliefs, conclusions, innuendo, suspicion, opinion, and similar non-factual matters” do not ordinarily satisfy the requirements for disqualification.),
 
 cert. denied,
 
 U.S., 115 S. Ct. 2250 (1995).
 

 In the instant case, Rippo’s conclusory allegations that Judge Bongiovanni had an opinion or interest in the outcome of Rippo’s case are not supported by any evidence. No evidence exists that the State was either involved in the federal investigation or conducting its own investigation of Judge Bongiovanni. A federal investigation of a judge does not by itself create an appearance of impropriety sufficient to warrant disqualification. No factual basis exists for Rippo’s argument that Judge Bongiovanni was under pressure to accommodate the State or treat criminal defendants in state proceedings less favorably. Thus, we conclude that
 
 *1249
 
 Rippo has failed to allege or establish legally cognizable grounds warranting disqualification.
 
 [1]
 

 Rippo also argues that after the conclusion of the trial, new information concerning the federal investigation of Judge Bongiovanni led to the discovery that Judge Bongiovanni “had a unique relationship with the business partner of . . . Denny Mason.” Denny Mason was a boyfriend of Lizzi and the owner of the stolen Visa card. Rippo moved for a new trial, alleging that “[a]t no time did the Judge advise that he knew [Mason] nor did the judge advise that he knew the business partner of Denny Mason; however the defense has learned that reputed Buffalo mob associate Ben Spano is the business partner of Denny Mason. . . Judge James A. Brennan, hearing the motion, denied a new trial. Rippo contends that (1) Judge Bongiovanni should have revealed on the record his relationship, and (2) the appearance of impropriety is sufficient to grant a new trial.
 

 “A judge should disclose on the record information that the judge believes the parties or their lawyers might reasonably consider relevant to the question of disqualification, even if the judge believes there is no real basis for disqualification.” NCJC Canon 3(E), Commentary.
 
 [2]
 
 We agree that, in some circumstances, a relationship between a judge and a victim may be relevant to the issue of disqualification and should therefore be revealed on the record. However, in the instant case, no evidence exists, beyond the allegations set forth by the defense, that Judge Bongiovanni knew either Denny Mason or his alleged business partner. Even if a relationship existed, Rippo has not shown that the judge’s alleged acquaintance with Mason’s business partner would result in bias.
 
 See, e.g.,
 
 Jacobson v. Manfredi, 100 Nev. 226, 679 P.2d 251 (1984) (allegations that judge had professional relationship with respondent’s aunt did not demonstrate judicial bias sufficient to find judge’s failure to recuse himself an abuse of discretion). Accordingly, we conclude that Rippo’s allegations that Judge Bongiovanni had a relationship, personal or professional, with the business partner of Mason does not support a
 
 *1250
 
 finding that Judge Bongiovanni abused his discretion in refusing to disqualify himself.
 

 Whether to grant or deny a motion for a new trial is within the trial court’s discretion. State v. Carroll, 109 Nev. 975, 977, 860 P.2d 179, 180 (1993). Because we conclude that disqualification was not warranted on the basis of Rippo’s unsupported allegations, we conclude that Judge Brennan did not abuse his discretion in denying the motion for a new trial.
 
 See
 
 Matter of Dunleavy, 104 Nev. 784, 789, 769 P.2d 1271, 1274 (1988) (Summary dismissal of a challenge is appropriate where the party does not allege legally cognizable grounds supporting a reasonable inference of bias or prejudice.).
 
 [3]
 

 Amendment of the indictment
 

 On March 16, 1994, the State filed a motion to submit an amended indictment to allege felony murder and aiding and abetting. Upon the district court’s denial of its request, the State filed a writ of mandamus with this court which was granted on April 27, 1995. Thereafter, the amended indictment was filed. Rippo now argues that the district court erred by amending the indictment without resubmitting it to the grand jury. In our April 27, 1995 order, we concluded that the amended indictment was proper. Accordingly, we decline to review Rippo’s argument further.
 

 Prosecutorial misconduct during the guilt phase
 

 1.
 
 Disclosure of new witnesses
 

 Rippo asserts that the State’s disclosure of several new witnesses after receiving Rippo’s notice of alibi was improper. We conclude there is no merit to Rippo’s contention that the State’s failure to oppose the subsequent continuance granted by the district court was “out of the ordinary” because the State had earlier filed a motion to expedite the trial date. The fact that the State did not oppose the motion for a continuance does not lead to
 
 *1251
 
 the conclusion that the State deliberately attempted to delay the trial through the late disclosure of the witnesses. Moreover, no evidence exists that the delay caused by the continuance prejudiced Rippo. We thus conclude that the prosecution’s failure to disclose timely the witnesses’ names does not warrant reversal.
 

 2.
 
 Witness intimidation
 

 Rippo also contends that the original prosecutors assigned to the case intimidated Alice Starr during a search of her home. Witness intimidation by a prosecutor can warrant a new trial if it results in a denial of the defendant’s right to a fair trial. State v. Owens, 753 P.2d 976, 978 (Utah Ct. App. 1988);
 
 see also
 
 Webb v. Texas, 409 U.S. 95 (1972) (defendant’s due process rights violated where trial judge implied that he expected witness to lie and assured witness that if he lied he would be prosecuted and convicted for perjury); United States v. MacCloskey, 682 F.2d 468, 479 (4th Cir. 1982) (U.S. Attorney’s suggestion that witness would be well-advised to remember the Fifth Amendment violated defendant’s right to present defense witness freely). A prosecutor has “a duty to refrain from improper methods calculated to produce a wrongful conviction.” Berger v. State, 295 U.S. 78, 88 (1934).
 

 The testimony of the officers and of Starr indicates that the officers did not draw their weapons in an attempt to intimidate Starr. However, Luken’s statements to Starr, made after she had been arrested for possession of drugs during a search conducted by four State authorities, may have been intimidating. Starr, however, testified that she did not feel threatened by Lukens or compelled to change her testimony.
 
 [4]
 
 Furthermore, Lukens and Lowry were disqualified from the case as a result of their participation in the search. Therefore, we conclude that prosecutors’ conduct did not constitute witness intimidation warranting reversal.
 

 3.
 
 Evidence of threats to witnesses
 

 The following testimony was elicited by defense counsel during cross-examination of David Levine, a prison inmate incarcerated with Rippo:
 

 Q: When you were released what facility were you released from?
 

 A: Jean.
 

 
 *1252
 
 Q. And was that the psychiatric facility?
 

 A Yes.
 

 Q And that’s where you were housed?
 

 A Yes.
 

 Q: How long did you spend on the psyche facility at prison?
 

 . almost two years, I think.
 

 Are you on any medications today?
 

 No.
 

 How long have you been olf them?
 

 I never been on them.
 

 They didn’t give you any medications when you were in the psyche ward?
 

 No, they kept me in there for protection.
 

 And why would that be?
 

 Because of this trial.
 

 On redirect, the State inquired as to why Levine was in the psychiatric facility:
 

 Q Why were you in a psychiatric facility?
 

 A They put me in there ’cause — for protection.
 

 Q Protection from what?
 

 A Probably because of some threats were made on me.
 

 Q For what reason?
 

 A For this trial.
 

 Q Because you were going to come in and testify?
 

 A Yes.
 

 Q Anybody ever threaten you? . . . Directly?
 

 A A couple of times.
 

 Q To your face?
 

 A Well, from a distance.
 

 Q You heard it though?
 

 A Yeah.
 

 Q Okay.
 

 A So did some of the staff members.
 

 And then you went into the psychiatric facility?
 

 Yes. . . .
 

 The prosecution’s intimations of witness intimidation by a defendant are reversible error unless the prosecutor also presents substantial credible evidence that the defendant was the source of the intimidation. Lay v. State, 110 Nev. 1189, 1193, 886 P.2d 448, 450-51 (1994) (citing United States v. Rios, 611 F.2d 1335,
 
 *1253
 
 1343 (10th Cir. 1979); United States v. Peak, 498 F.2d 1337, 1339 (6th Cir. 1974); United States v. Hayward, 420 F.2d 142, 147 (D.C. Cir. 1969); Hall v. United States, 419 F.2d 582, 585 (5th Cir. 1969)). Where counsel opens the door to the disputed questions, however, opposing counsel may properly question the witness in order to rehabilitate him or her. Wesley v. State, 112 Nev. 503, 513, 916 P.2d 793, 800 (1996),
 
 cert.
 
 denied,.U.S. ., 117 S. Ct. 1268 (1997).
 

 Rippo’s counsel opened the door when, on cross-examination, he asked Levine about his confinement at the psychiatric facility and the reasons why he was housed there. In an apparent attempt to portray Levine as mentally unstable, defense counsel elicited information suggesting that Levine had been threatened. Therefore, we conclude that the district attorney properly explored the testimony given during cross-examination and questioned Levine in an effort to rehabilitate his credibility.
 

 4.
 
 The State’s closing argument
 

 During closing argument, the prosecutor stated:
 

 I’m talking about Mr. Rippo having the opportunity to kill them — to commit the murder. The opportunity was there, plain and simple. And interestingly, there has been no testimony that he was some place else.
 

 The only person who tells us where he was on February the 18th, 1992, is Diana Hunt.
 

 You haven’t heard any witness come into this courtroom, take the oath and sit down there and say Michael Beaudoin told me that he did it. You haven’t heard any witness come in here and say Tom Simms told me that he did it; or any of the other names that you’ve heard. There has been no indication in this case at all except what we have shown here.
 

 At the next break, the defense moved for a mistrial on the ground that the prosecution had shifted the burden of proof to the defendant. The district court denied the motion. Rippo now argues that in addition to shifting the burden of proof, the prosecutor implicitly commented on Rippo’s decision not to testify.
 

 It is generally improper for a prosecutor to comment on a defendant’s failure to call a witness. Whitney v. State, 112 Nev. 499, 502, 915 P.2d 881, 882 (1996). Such comment can be viewed as impermissibly shifting the burden of proof to the defense.
 
 Id.; accord
 
 Barron v. State, 105 Nev. 767, 778, 783 P.2d 444, 451 (1989). We conclude that the prosecutor made
 
 *1254
 
 impermissible references to Rippo’s failure to call any witnesses on his behalf and, in so doing, may have shifted the burden of proof to the defense. However, we conclude that error was harmless in light of the overwhelming evidence of guilt supporting Rippo’s conviction.
 
 Cf.
 
 Morris v. State, 112 Nev. 260, 264, 913 P.2d 1264, 1267-68 (1996) (improper comment by prosecutor on post-arrest silence of defendant does not require reversal if references are harmless beyond a reasonable doubt and such references will be considered harmless beyond a reasonable doubt if there is overwhelming evidence of guilt).
 

 Although the prosecutor referred to the lack of testimony in support of Rippo’s case, the remarks did not directly comment on
 
 Rippo’s
 
 failure to take the stand.
 
 See
 
 Barron v. State, 105 Nev. 767, 778, 783 P.2d 444, 451 (1989). Further, we do not find that the prosecutor manifestly intended the comments as a reference to Rippo’s failure to testify on his behalf.
 
 See id.
 
 at 779, 783 P.2d at 452 (When reference is indirect, the test for determining whether prosecutorial comment constitutes a constitutionally impermissible reference to a defendant’s failure to testify is whether “the language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be comment on the defendant’s failure to testify.”) (quoting United States v. Lyon, 397 F.2d 505, 509 (7th Cir. 1968)). Accordingly, we conclude that this argument lacks merit.
 

 During closing argument, the prosecutor also stated, “[Hunt] said that [Rippo] hit [Hunt] repeatedly in the face and then pulled out the stun gun, . . . and she showed the marks that she has on her back from where he used the gun on her.” The defense objected to the argument on the ground that Hunt never showed the court any marks on her back. In response, the prosecutor stated,
 

 You are the triers of fact. When I sit down, the role of the prosecutors ... is over. So I urge you to rely upon your own recollections.
 

 There are many things that happen, interviews outside of the courtroom, and so, occasionally, if there is some confusion about precisely what happened in the courtroom, I do beg your indulgence; but if she didn’t do that in open court, then I misspoke making that argument.
 

 The defense objected on the ground that the prosecution was referring to events outside of the court. On appeal, Rippo argues that the prosecutor’s statements are so prejudicial as to warrant reversal.
 

 
 *1255
 
 We conclude that the prosecutor’s comments concerning the stun gun and his subsequent comments to the effect that interviews and “things” happen outside the courtroom were improper references to evidence not presented at trial.
 
 See
 
 Schrader v. State, 102 Nev. 64, 714 P.2d 1008 (1986) (reference to information or conversations which occurred outside of the courtroom is improper during closing argument). However, we conclude that any error caused by these comments was harmless in light of the overwhelming evidence against Rippo.
 
 See
 
 Ybarra v. State, 103 Nev. 8, 16, 731 P.2d 353, 358 (1987).
 

 Finally, Rippo argues that the prosecutor improperly expressed his personal belief concerning the evidence. We conclude that the statements do not contain prosecutorial vouching. The prosecutor did not characterize the testimony of the witnesses, nor did he express a personal belief concerning the evidence before the jury. Therefore, this argument lacks merit.
 
 Cf.
 
 Witherow v. State, 104 Nev. 721, 724, 765 P.2d 1153, 1155 (1988) (improper for prosecutor to state opinion as to veracity of witness).
 
 [5]
 

 Motion to disqualify the entire district attorney’s office
 

 Rippo argues that the district court erred in failing to disqualify the entire prosecutor’s office in light of Lukens and Lowry’s misconduct preceding their disqualification and in light of Lukens’ continued interest in the case after his disqualification. Rippo contends that although Lukens was disqualified, he was present in court for the opening statements, followed the order of the witnesses, and spoke with witness Diana Hunt during trial.
 

 We conclude that Rippo failed to make a showing of extreme circumstances warranting disqualification of the entire district attorney’s office.
 
 See
 
 Collier v. Legakes, 98 Nev. 307, 309, 646 P.2d 1219, 1220 (1982) (disqualification of a prosecutor’s office is warranted only in extreme circumstances). First, the fact that Lukens was present for opening statements and followed the order of the witnesses may show a continued interest in the trial, but it is not evidence of continued involvement. Second, although Lukens acknowledged that he “had occasion to have discussions with [Hunt] this week,” no evidence exists as to the content or
 
 *1256
 
 nature of the conversations. Third, the judge admonished Lukens not to speak further with any witnesses, and no evidence has been presented that Lukens failed to abide by this order. The district court’s disqualification of Lukens and Lowry was sufficient to ensure that Rippo received a fair trial. Thus, we conclude that the district court did not abuse its discretion in failing to disqualify the prosecutor’s office.
 

 Brady violations
 

 During his opening statement at the guilt phase, the prosecution told the jury that Thomas Simms would testify that Rippo had admitted to “strangling those bitches” and that when Simms asked Rippo why he killed the women, Rippo replied that he accidentally killed the first one, so he had to kill the second one. At the next break in the trial, Rippo moved for a mistrial based on an alleged discovery violation regarding Rippo’s statements to Simms. Rippo argued that none of the statements concerning his confession to Simms had been included in the documents obtained pursuant to the discovery order. The State argued that (1) Simms was identified as a witness and the defense could have interviewed him prior to trial, (2) the prosecuting attorney learned of the admission during a pretrial conference one week earlier, at which time Simms disclosed the statements, and (3) the statements were never written down or recorded. The district court denied Rippo’s motion.
 

 After cross-examination of Simms at trial, another motion for a mistrial was made outside the presence of the jury on the ground that Simms testified that he had two years earlier informed former prosecutors about Rippo’s statements. The district court conducted an evidentiary hearing on the matter. At the conclusion of the evidentiary hearing, the trial court denied the motion for a mistrial. The district court continued the trial for two weeks to give Rippo’s counsel time to interview witnesses regarding the statements made to Simms.
 

 On appeal Rippo asserts that the State withheld the statements in violation of Brady v. Maryland, 373 U.S. 83 (1963).
 
 [6]
 
 The prosecution must disclose to the defense evidence in its possession that is both favorable to the accused and material to guilt or punishment.
 
 Brady,
 
 373 U.S. at 87; Roberts v. State, 110 Nev.
 
 *1257
 
 1121, 1127, 881 P.2d 1, 5 (1994). In determining whether evidence is
 
 Brady
 
 material, the court should look at the following: “(a) suppression by the prosecution after a request by the defense, (b) the evidence’s favorable character for the defense, and (c) the materiality of the evidence.” Moore v. Illinois, 408 U.S. 786, 794-95 (1972); Homick v. State, 112 Nev. 304, 314, 913 P.2d 1280, 1287,
 
 cert.
 
 denied, U.S., 117 S. Ct. 519 (1996).
 

 Federal courts have consistently held that a
 
 Brady
 
 violation does not result if the defendant, exercising reasonable diligence, could have obtained the information.
 
 See, e.g.,
 
 Williams v. Scott, 35 F.3d 159, 163 (5th Cir.)
 
 (Brady
 
 claim fails where appellant could have obtained exculpatory statement through reasonable diligence),
 
 cert. denied,
 
 513 U.S. 1137 (1995); United States v. Dupuy, 760 F.2d 1492, 1501 n.5 (9th Cir. 1985) (“if the means of obtaining the exculpatory evidence has been provided to the defense, the
 
 Brady
 
 claim fails”); United States v. Griggs, 713 F.2d 672, 674 (11th Cir. 1983) (where prosecution disclosed identity of witness, it was within the defendant’s knowledge to have ascertained the alleged
 
 Brady
 
 material); United States v. Brown, 582 F.2d 197, 200 (2d Cir. 1978) (no violation where defendant was aware of essential facts enabling him to take advantage of the exculpatory evidence).
 
 [7]
 

 We first conclude that the statement, “I killed those two bitches,” is an inculpatory admission. Therefore, this statement does not fall under
 
 Brady. See Brady,
 
 373 U.S. at 87;
 
 Roberts,
 
 110 Nev. at 1172, 881 P.2d at 5.
 

 In the instant matter, the prosecution identified Simms as a witness and provided the defense with Simms’ grand jury testimony revealing that Rippo had visited Simms the day of the murders and had offered to sell him a burgundy car belonging to one of the victims.
 
 [8]
 
 We conclude that the knowledge that Simms spoke with Rippo shortly after the murders should have put Rippo’s counsel on notice that Simms might have potentially incriminating or exculpatory evidence, and that using reasonable diligence, Rippo’s counsel could have obtained the information through an interview. Further, we note that the district court
 
 *1258
 
 granted Rippo a two-week continuance to interview Simms and other witnesses, thereby removing the prejudicial impact of learning of the statements after trial commenced.
 

 During the penalty phase, the State called Howard Saxon, a state parole and probation officer. Saxon testified that Rippo was on parole and under a sentence of imprisonment at the time of the murders. Saxon testified that his supervisor was Officer Schmelz, and that Rippo told Schmelz that he would rather be convicted of murder than sexual assault because murder sounded better. Rippo contends that the State violated
 
 Brady
 
 by failing to turn over Saxon’s statements. We conclude that no
 
 Brady
 
 violation occurred because (1) the statement is not exculpatory and (2) pursuant to the State’s open file policy, the defense could have inspected the State’s files and discovered the statement and thus the prosecution did not suppress the evidence.
 
 [9]
 

 See, e.g., Dupuy,
 
 760 F.2d at 1501 n.5.
 

 Other bad act testimony
 

 1.
 
 Use of Sears credit card
 

 During trial, the State sought to introduce evidence that Rippo had used Lizzi’s Sears credit card after the date of the murders.
 
 [10]
 
 Rippo objected, and following a
 
 Petrocelli
 
 hearing outside the presence of the jury, the evidence was admitted.
 
 See
 
 Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985) (before district court may admit evidence of an independent bad act, it must conduct a hearing outside the jury’s presence, during which the state must prove by clear and convincing evidence that the defendant committed the act, and the district court must determine that the evidence is admissible and balance its probative value and prejudicial effect). Rippo argues that the district court abused its discretion in allowing testimony regarding Rippo’s use of the Sears credit card.
 

 During the
 
 Petrocelli
 
 hearing, the State introduced a credit card receipt from Sears and the testimony of Carlos Caipa, the sales
 
 *1259
 
 manager at Sears. Caipa testified that a man resembling Rippo purchased several items with a credit card bearing Lizzi’s name.
 

 Upon review of the arguments in the record, we conclude that the district court did not abuse its discretion in admitting the evidence.
 
 See
 
 Cipriano v. State, 111 Nev. 534, 541, 894 P.2d 347, 352 (1995) (whether to admit or exclude evidence of other wrongs, crimes, or bad acts is within the trial court’s discretion). The evidence is relevant to show Rippo’s connection with the victims and the scene of the crime, and it tends to prove Rippo’s motive of robbery.
 
 See
 
 NRS 48.045(2) (Evidence of other crimes is admissible to prove “motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.”). In addition, we conclude that this evidence is more probative than prejudicial.
 
 See
 
 Armstrong v. State, 110 Nev. 1322, 1323, 885 P.2d 600, 601 (1994) (district court must weigh the probative value of the proffered evidence against its prejudicial effect).
 

 2.
 
 Prior Sexual Assault
 

 During trial, Thomas Simms testified, without objection by Rippo’s defense counsel, that Rippo told Simms with regard to the victims that “I could have f[ — ]ked both of them, but I didn’t . . . That means I’m cured.” Rippo argues that the jury must have inferred from this testimony that Rippo had committed a prior sexual assault or had a criminal history. We decline to address this argument due to Rippo’s failure to object during trial.
 
 See
 
 Garner v. State, 78 Nev. 366, 372-73, 374 P.2d 525, 529 (1962) (failure to object generally precludes appellate consideration).
 

 3.
 
 Drug transactions
 

 Rippo contends that the testimony of a jail inmate was improper evidence that Rippo was conducting drug transactions within the jail.
 
 [11]
 
 We conclude that Levine’s testimony was too limited and vague to imply that Rippo was conducting drug sales while in jail. Moreover, the jury heard about Rippo’s involvement with drugs through the testimony of Hunt and Simms. Therefore, we conclude that this argument lacks merit.
 

 
 *1260
 

 Prosecutorial misconduct during the penalty phase
 

 1.
 
 The State’s opening statement
 

 During the opening statement at the penalty phase, the prosecutor used the terms “horror” and “horrendous” to describe Rippo’s actions in committing a prior sexual assault. “ ‘[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor’s comments standing alone, for the statements or conduct must be viewed in context; only by doing so can it be determined whether the prosecutor’s conduct affected the fairness of the trial.’ ” Greene v. State, 113 Nev. 157, 169, 931 P.2d 54, 62 (1997) (quoting United States v. Young, 470 U.S. 1, 11 (1985)). It is not enough that the prosecutor’s statements are undesirable. Darden v. Wainwright, 477 U.S. 168, 181 (1986). The relevant inquiry is whether the prosecutor’s statements so infected the proceedings with unfairness as to make the results a denial of due process.
 
 Id.
 
 at 181;
 
 Greene,
 
 113 Nev. at 169, 931 P.2d at 62.
 

 We conclude that the prosecutor’s use of the words “horror” and “horrendous” to describe Rippo’s acts did not deprive Rippo of a fair trial. The prosecutor did not misstate the evidence but indicated what the evidence would, and did, show.
 
 See Garner,
 
 78 Nev. at 371, 374 P.2d at 528 (1962). Further, the district court instructed the jury to base its decision on the evidence before it, not on the attorneys’ arguments.
 

 Rippo next contends that the prosecutor’s reference to Rippo as “evil” was improper. Rippo did not interpose an objection below. Therefore, we conclude that Rippo’s failure to object to the statement precludes appellate consideration.
 
 See id.
 
 at 372-73, 374 P.2d at 529.
 

 2.
 
 The State’s closing argument
 

 During the closing statement at the penalty phase, the prosecutor stated:
 

 It is appropriate that society express its moral outrage at the murder of innocent human beings. . . . And it furthermore is important that stiff, severe penalties be imposed because that deters, because what you do today will deter Mr. Rippo, and because what you do today sends out a message to other persons that indicates this society, this country will not — . [Objection by defense counsel]
 

 
 *1261
 
 This community must know that we will not tolerate double murders perpetrated upon young women .... There are reasons for the death penalty .... That’s to send a message to society.
 

 Rippo contends that the prosecutor’s statements improperly urged the jury to send a message to society through imposition of the death penalty.
 

 We conclude that the prosecutor’s statements constitute an explanation of the rationales supporting the death penalty. This is a proper area for prosecutorial comment.
 
 See
 
 Collier v. State, 101 Nev. 473, 705 P.2d 1126 (1985) (the prosecutor may discuss general theories of penology such as the merits of punishment, deterrence, and the death penalty);
 
 see also
 
 Witter v. State, 112 Nev. 908, 921 P.2d 886,
 
 cert. denied,
 
 U.S., 117 S. Ct. 1708 (1997).
 

 Victim-impact testimony
 

 Questions of admissibility of testimony during the penalty phase of a capital trial are largely left to the trial judge’s discretion and will not be disturbed absent an abuse of discretion. Smith v. State, 110 Nev. 1094, 1106, 881 P.2d 649, 656 (1994). A jury considering the death penalty may consider victim-impact evidence as it relates to the victim’s character and the emotional impact of the murder on the victim’s family. Payne v. Tennessee, 501 U.S. 808, 827 (1991); Homick v. State, 108 Nev. 127, 136, 825 P.2d 600, 606 (1992);
 
 see also
 
 NRS 175.552. A victim can express an opinion regarding the defendant’s sentence only in non-capital cases.
 
 Witter,
 
 112 Nev. at 922, 921 P.2d at 896.
 

 Five witnesses testified as to the character of the victims and the impact the victims’ deaths had on the witnesses’ lives and the lives of their families. We conclude that each testimonial was individual in nature, and that the admission of the testimony was neither cumulative nor excessive. Thus, we conclude that the district court did not abuse its discretion in allowing all five witnesses to testify.
 

 Three of the witnesses referred to the brutal nature of the crime.
 
 [12]
 
 The State instructed the family members not to testify
 
 *1262
 
 about how heinous the crimes were, and the district court apparently relied, in part, on these instructions in allowing the victim-impact testimony. Thus, the testimony, insofar as it described the nature of the victims’ deaths went beyond the boundaries set forth by the State. However, the fact that the murders were brutal certainly contributed to the emotional suffering of the victims’ families. Therefore, we conclude that the statements were relevant to Rippo’s moral culpability and blameworthiness.
 
 See Payne,
 
 501 U.S. at 825;
 
 see also
 
 Atkins v. State, 112 Nev. 1122, 1136, 923 P.2d 1119, 1128 (1996) (prosecutor’s statements that defendant “brutally murdered” and “savaged” the victim were proper to describe the impact of the crime on the victim and her family),
 
 cert. denied,
 
 U.S., 117 S. Ct. 1267 (1997).
 

 Rippo also argues that the district court abused its discretion by allowing Orell Maxwell to testify after the State indicated it would only call one witness to testify on behalf of Jacobson. We conclude that the testimony of Maxwell was relevant to the jury’s determination of the appropriate sentence. We further note that Rippo’s counsel did not object to the introduction of Maxwell’s testimony nor did he object to the statements she made. Rather, he waited until all five witnesses had testified before moving to strike the death penalty. We conclude that the district court did not abuse its discretion by allowing the State to present the testimony of a second witness because the defense interposed no immediate objection, and Rippo has failed to show any prejudice.
 

 Jury instructions
 

 Rippo contends that the district court’s anti-sympathy instruction violated his constitutional right to present relevant mitigating evidence. A district court may instruct the jury not to consider sympathy during a capital penalty hearing, as long as the court also instructs the jury to consider mitigating facts. Riley v. State, 107 Nev. 205, 215-16, 808 P.2d 551, 557 (1991); Hogan v. State, 103 Nev. 21, 25, 732 P.2d 422, 424 (1987). Here, the district court instructed the jury to consider mitigating factors in deciding the appropriate penalty. Therefore, this argument lacks merit.
 

 
 *1263
 

 Torture as an aggravating circumstance
 

 Rippo argues that insufficient evidence exists to support the aggravating circumstance of torture set forth in NRS 200.033(8).
 

 The State argues that the testimony of Hunt and Dr. Green are evidence that Rippo tortured the victims. Hunt testified that Rippo instructed her to hit Jacobson over the head with a beer bottle; Rippo continually stunned Lizzi with a stun gun; Rippo tied the hands and feet of Jacobson, dragged her across the floor, and placed a gag in her mouth; Rippo tied the hands and feet of Lizzi; and while Rippo was choking Lizzi, the whole front of her body was oif the ground and she was making an animal-like noise. Dr. Green testified that both women’s injuries included scrapes, stab wounds, and ligature marks. He testified that Lizzi died from manual and ligature strangulation, but could not testify as to whether the stab wounds or the ligature wounds occurred first. Dr. Green testified that Jacobson died from asphyxiation due to manual strangulation. The State also points out that it takes several minutes to strangle someone to death manually. In sum, the State argues that the stunning, stab wounds, scratches, and slow strangulation are evidence that Rippo tortured the women before he killed them.
 

 Most of the evidence presented by the State is comprised of evidence of Rippo’s attempts to kill the women by strangling. These killing acts, by themselves, do not constitute torture. The only evidence that can support a finding of torture murder is Hunt’s testimony that Rippo repeatedly assaulted each of the women.
 

 NRS 200.030 defines murder by torture in terms of murder that is “[p]erpetrated by means of . . . torture.” This language would seem to indicate that the torturing acts must be the killing acts, that is to say killing
 
 by means of
 
 torture. The district court instructed the jury that in order to find torture, it must find that “the act or acts which caused the death must involve a high degree of probability of death, and the defendant must commit such an act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, persuasion, or for any other sadistic purpose. . . . [T] or ture . . . [does not] require any proof that the defendant intended to kill the deceased, nor does it necessarily require any proof that the deceased suffered pain.” Under the instruction as given, the jury was required to find that the acts of torture must have “caused the death” and must have “involve[d] a high degree of probability of death.” Like the statute, the instruction seems to require that the killing itself was
 
 *1264
 
 accomplished
 
 by means
 
 of torture. In other words, the actions which inflict the pain must also be the “cause of the victim’s death.” I CALJIC § 8.24, at 401 (6th ed. 1996) (murder by torture requires that acts of perpetrator be the “cause of victim’s death”).
 

 Obviously, these two murder victims were not killed
 
 by means of a
 
 stun gun; and, even if it were to be argued that the use of the stun gun was done sadistically, under a strict reading of NRS 200.030 and the proffered instruction, Rippo’s shooting his victims with a stun gun would not involve murder by torture. Nonetheless, we conclude that there is evidence which would support a finding of “murder by means of . . . torture” because the intentional infliction of pain is so much an integral part of these murders. Persons who taunt and torture their murder victims as part of the killing process will not be allowed to escape the murder-by-torture aggravating factor merely because the torturing is not the actual cause of death.
 

 Our interpretation of murder by torture finds support in the California case, People v. Proctor, 842 P.2d 1100 (1992). In
 
 Proctor
 
 the California Supreme Court held that “acts of torture may not be segregated into their constituent elements in order to determine whether any single act by itself caused the death; rather, it is the continuum of sadistic violence that constitutes the torture.”
 

 There seems to be little doubt that when Rippo was shocking these victims with a stun gun, he was doing so for the purpose of causing them pain and terror and for no other purpose. Rippo was not shocking these women with a stun gun for the purpose of killing them but, rather, it would appear, with a purely “sadistic purpose.” When we review the facts of this case and consider the entire episode as a whole — the strangulation and restraint, accompanied by the frightful, multiple blasts with a painful high voltage stun gun — we conclude that even though the stun gun shocks were not the cause of death, there is still evidence, under our interpretation of murder perpetrated by means of torture, to support a jury finding that there was, as an inseparable ingredient of these murders, a “continuum” or pattern of sadistic violence that justified the jury in concluding that these two murders were “perpetrated by means of . . . torture.”
 

 Aggravating circumstances
 

 NRS 200.033(4) does not require that the State first charge the defendant with a crime before that crime can be used as an
 
 *1265
 
 aggravating circumstance. Bennett v. State, 106 Nev. 135, 141, 787 P.2d 797, 801 (1990). “A primary concern with respect to the finding of aggravating circumstances at the penalty hearing is to provide an accused notice and to insure due process so the accused can meet any new evidence which may be presented during the penalty hearing.”
 
 Id.
 
 at 142, 787 P.2d at 801. Rippo was put on notice that burglary and kidnapping would be presented as aggravating factors through the amended notice of intent to seek the death penalty. Accordingly, we conclude that the fact that Rippo was not charged with either burglary or kidnapping does not prevent them from being offered as aggravating factors.
 

 If a defendant can be prosecuted for each crime separately, each crime can be used as an aggravating circumstance.
 
 Bennett,
 
 106 Nev. at 142, 787 P.2d at 801. Upon review, we conclude that Rippo could have been prosecuted separately for each of the underlying felonies, and therefore each crime was properly considered as an aggravating circumstance.
 

 NRS 177.055(2) requires this court to review whether the sentences of death were imposed under the influence of passion, prejudice, or any arbitrary factor, and whether the sentences are excessive considering both the crime and the defendant. The jury heard evidence relating to both aggravating and mitigating circumstances, finding five valid aggravating circumstances and no mitigating circumstances. We conclude that the sentences of death were not imposed under the influence of passion, prejudice, or any arbitrary factor, and that the sentences were not excessive considering both the crimes and the defendant. Therefore, we hold that the sentences of death were appropriate under NRS 177.055(2).
 

 CONCLUSION
 

 The judgment of conviction for two counts of first-degree murder, one count of robbery, one count of unauthorized use of a credit card, and two sentences of death are affirmed.
 

 [1]
 

 We further note that Judge Bongiovanni’s disqualification in the instant case would lead to his disqualification in all criminal cases he heard while subject to the federal investigation. Such a result would be insupportable.
 

 [2]
 

 We have previously noted that the Commentary to the Code of Judicial Conduct gives guidance to the interpretation of the Canons and Rules and is not a statement of additional rules.
 
 See PETA,
 
 111 Nev. at 436 n.5, 894 P.2d at 340 n.5.
 

 [3]
 

 Rippo also argues that we should remand the case for an evidentiary hearing to determine whether the State was involved in the federal investigation and the extent of Judge Bongiovanni’s relationship with the business partner of Mason. Only then, Rippo contends, will it be known if a conflict of interest existed. We have held in other contexts that “bare” or “naked” allegations do not entitle an appellant to an evidentiary hearing.
 
 See, e.g.,
 
 Hargrove v. State, 100 Nev. 498, 686 P.2d 222 (1984). The same rule should apply in this case. We therefore conclude that, absent factual grounds which would allow for a reasonable inference that a conflict existed, Rippo is not entitled to an evidentiary hearing.
 

 [4]
 

 The record indicates that Starr did not testify on behalf of either the State or Rippo during trial.
 

 [5]
 

 We conclude that two errors occurred during the guilt phase of the trial, namely, the prosecutor referred to evidence not presented at trial and commented on Rippo’s failure to call a witness. We conclude that, faced with the evidence in this case, the jurors would have reached the same outcome had the errors not occurred. Therefore, we conclude that Rippo’s contention that cumulative error warrants reversal lacks merit.
 
 See
 
 Sipsas v. State, 102 Nev. 119, 716 P.2d 231 (1986).
 

 [6]
 

 Although Rippo argued below that the statements were withheld in violation of a discovery order, on appeal he does not set forth any authority to examine and analyze a discovery violation. Rather, his brief argues that the State violated
 
 Brady.
 
 Therefore, we address only the
 
 Brady
 
 claim.
 

 [7]
 

 See also Moore,
 
 408 U.S. at 795, in which the Court observed, “We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.”
 

 [8]
 

 Simms testified: “Well, I asked [Rippo] where the car came from and he told me that someone had died for the car. . . . [Rippo] wanted me to loan him some money. ... He said he needed about $2,000 ... to leave town.”
 

 [9]
 

 Because we conclude that two of the statements were unfavorable to the defense and that the prosecution did not suppress the evidence and thus no
 
 Brady
 
 violations occurred, we need not reach the issue of whether the statements were material.
 

 [10]
 

 Rippo was charged with the unauthorized use of a credit card; however, the charge related only to use of the gold Visa card belonging to Denny Mason.
 

 [11]
 

 David Levine testified that he met Rippo while in jail and that he delivered messages from Rippo to Starr regarding drugs. He stated that he would “hook up drug deals and stuff and handle things, like for the — for the court; get in touch with the attorney, request [Rippo’s] attorney, stuff like that.” The defense objected to the testimony, and the State ceased this line of questioning.
 

 [12]
 

 Orell Maxwell, Jacobson’s mother-in-law, testified that her son and granddaughter “must cope with the horror of the brutal and violent manner of [Jacobson’s] death.” Nicholas Lizzi, Lizzi’s father, referred to the “horror” of losing his daughter “so brutally.” Nicholas Lizzi, Jr., Lizzi’s
 
 *1262
 
 brother, spoke about preparing for her funeral and stated, “[We] decidefd] to keep the casket closed because she looked so fake, covered with makeup to hide the trauma she had been through.” He further stated, “[K]nowing she was murdered in the horrible way she was makes it ever so difficult to trust any human being. It overwhelms me that anyone is capable of committing such heinous crimes and lives on this planet.”