FREDERICK LEE STEESE, Appellant, v. THE
STATE OF NEVADA, Respondent.

No. 27197

May 19, 1998 960 P.2d 321

*Woodburn & Wedge* and *James William Erbeck*, Las Vegas, for
Appellant.

*Frankie Sue Del Papa*, Attorney General, Carson City; *Stewart
L. Bell*, District Attorney, *James Tufteland*, Chief Deputy District Attorney, and *William D. Kephart*, Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, YOUNG, J:

On June 4, 1992, Detective Norval Risenhoover ("Risenhoover") of the North Las Vegas Police Department responded to a report of a dead body at the Silver Nugget Camperland. Risenhoover entered a camping trailer and saw the body of a nude male stretched across the floor in the doorway between the bedroom and the bathroom. The man's body had multiple stab wounds on the upper torso, head, and neck. An orange towel was draped over the face. It appeared that a struggle had taken place. Bathroom fixtures had been broken and a curtain

valance in the bedroom had been pulled from the wall. Blood was spattered throughout the bathroom and had soaked through the mattress in the bedroom. There was a broken candle and a candle base on the floor. In addition, the trailer was apparently ransacked. Cabinets had been opened and their contents strewn about the bedroom, kitchen, and bathroom. Risenhoover found an empty cabinet which appeared to have recently held a television set and VCR.

Risenhoover determined that the body was that of Gerard Soules ("Soules"). Soules had been discovered by his employer, Mike Hartzell ("Hartzell"), who was the entertainment director for Circus Circus, the Excalibur, and the Luxor Hotel-Casinos. Soules performed a "fun and family oriented" act at Circus Circus which involved dogs trained to perform tricks in ballerina costumes. Soules was usually very dependable, so Hartzell became concerned when he missed a performance. Hartzell went to the Silver Nugget Camperland, a trailer park in North Las Vegas, and asked which space was rented by Soules. He knocked on Soules' door and, when there was no answer, opened it. Hartzell noted that the windows to the trailer were open, but that Soules' truck was gone. He heard dogs barking in the back of the trailer. Immediately feeling that something was wrong, Hartzell closed the door and found the trailer park manager and two security guards. The four returned to the trailer and discovered Soules' body. One of the security guards notified the North Las Vegas Police Department.

Sandra Neilson ("Neilson"), a police identification technician, also responded to the call. She took samples of blood, dusted for fingerprints, and photographed the crime scene.

On June 4, 1992, Risenhoover spoke with Michael Moore ("Moore"), one of Soules' neighbors. Moore stated that he had seen Soules with two men, separately, on the night of June 3, 1992. Moore described one of these men as 5'8" tall and 160-170 pounds, with thinning reddish-brown hair. Moore recognized this man as someone who had been staying in Soules' trailer for the previous two or three weeks. The other individual was younger and had blonde hair. Moore saw the younger man leave on a motorcycle that evening, but he did not see the first man leave.

On June 6, 1992, the manager of the trailer park notified Risenhoover that a letter arrived addressed to "Fred Burke," care of Gerard Soules. The police subsequently discovered that "Fred Burke" was an alias used by appellant Frederick Lee Steese ("Steese"). The letter was from Rick Rock ("Rock") of Pocono Pines, Pennsylvania. On June 10, 1992, Risenhoover contacted Rock. Rock informed Risenhoover that to his knowledge, Steese

lived in Las Vegas. Risenhoover asked Rock to notify him if he heard from Steese. In addition, Rock gave Risenhoover permission to open the letter. Rock later telephoned Risenhoover and gave him the number of a pay phone in Indiana at which Steese could be reached.

Steese was a self-described hobo: a drifter who travelled by hitchhiking, jumping trains, and stealing trucks. He earned his living through a combination of odd jobs, panhandling, and petty crimes. At one time, Steese had hitched a ride with Rock, and the two apparently developed a sexual relationship.

On June 12, 1992, Risenhoover telephoned Steese at the number supplied by Rock. Risenhoover informed Steese that he was investigating the murder of Soules. Steese asked where and how Soules had been killed. Risenhoover told him that Soules had been stabbed while in his home, but he did not tell Steese how many times Soules had been stabbed.[2] Steese told Risenhoover that he was a friend of Soules and had been living with him in Las Vegas, but that he had left on friendly terms on June 4 or 5, 1992. Risenhoover then obtained Steese's social security number and birth date. Steese told Risenhoover that he could be reached through Rock. Steese then telephoned Rock.

After speaking with Steese, Rock called Risenhoover and told him that Steese had called. Rock told Risenhoover that Steese had told him Soules had been stabbed over one hundred times. Risenhoover took note of this because he had not told Steese the actual number of stab wounds, nor had that information been in news reports of the crime. At trial, Steese testified that he simply made up the number.

Steese testified that Rock advised him to return to Las Vegas in order to "straighten this out." Steese jumped a train from Indiana to Portage, Wisconsin. In Portage, he stole a semi truck, which he drove to Nevada. Steese testified that during this trip, he kept himself awake with "speedballs," a mixture of cocaine and heroin. On June 18, 1992, at about 10:30 a.m., Steese was stopped for speeding near Alamo, Nevada, by two Nevada Highway Patrol troopers. Trooper Joseph Lawrence ("Lawrence") testified that Steese did not appear to be under the influence of drugs or alcohol at the time. The two troopers discovered that the truck was stolen and arrested Steese. In the cab of the truck, Lawrence found an address book with Soules' address in it. Lawrence remembered that Soules' murder was being investigated, so he notified the North Las Vegas Police Department. The highway patrolmen then took Steese to the Clark County Detention Center.

---

[2]Soules had been stabbed numerous times; the coroner stopped counting at thirty-seven.

Steese was taken into custody by the North Las Vegas Police at about 3:30 p.m. that day. Steese waived his *Miranda* rights and was interviewed by Risenhoover and James Jackson ("Jackson"), another detective. Steese filled out a written questionnaire in which he stated that he knew Soules, but that he did not have any information regarding Soules' death. Jackson, who was trained in interpreting such questionnaires, noted a number of points at which verbal cues indicated that Steese was attempting to deceive the detectives. Upon further questioning, Steese stated that if he killed Soules, he did not remember. Shortly thereafter, Steese admitted that he killed Soules, but it was because Soules had chained him to the bed with dog leashes and was about to sodomize him with a toilet plunger. Risenhoover pointed out that neither leashes nor a toilet plunger was found at the scene. Steese next told the detectives that Soules owed him money, so he went to Soules' home to collect it, and an argument about money escalated into a fight that left Soules dead. Risenhoover pointed out that all the nightlights had been unplugged, indicating a burglary. At that point, Steese admitted that he simply intended to rob Soules, but that Soules awoke during the course of the burglary.

At 9:40 p.m., Steese began making a transcribed confession to Risenhoover and Jackson. Steese stated that he had hitched a ride with Soules near the end of May 1992. The two had dinner together that evening and formed a sexual relationship. Soules asked Steese if he wanted to work as his assistant in the dog act. Steese accepted the offer. Soules introduced Steese to Hartzell, who told Steese that he would need to obtain a sheriff's work card in order to work at Circus Circus. Steese attempted to obtain this card, but his application was denied due to a parole violation in Florida. Steese decided to move on, so Soules dropped him off at a freeway exit ramp. Steese then purchased and drank a twelve-pack of beer. Intoxicated and impecunious, Steese decided to return to Soules' trailer in order to steal his VCR.

When it became dark, Steese went to Soules' trailer. He entered and pulled out all the nightlights in order to make the trailer completely dark. While removing the VCR, Steese heard Soules stirring in the bedroom, so he grabbed "an object that was round and heavy" and struck Soules' head with it. Soules ran into the bathroom and shut the door. Steese obtained a knife from the kitchen, then "rushed in there [the bathroom] and stabbed him in the chest and stomach area, slicing him and he was quiet, he fell to the ground." During the confession, Risenhoover asked Steese how many times he had stabbed Soules, to which Steese replied, "I don't know. Maybe 100."

Steese stated that he then covered Soules' face and searched throughout the trailer for anything of value. He took a camera, a

television set, and a VCR, as well as the knife he used to stab Soules. Steese loaded these items into Soules' truck, which he drove toward Lake Mead. Steese stopped at a bait shop on the way and sold the television set, VCR, and camera to someone for $100.00. Steese then purchased another twelve-pack of beer at the bait shop. He took this beer to Lake Mead and turned off the main road in order to dispose of the knife. The truck got stuck in a wash near Lake Mead. Steese and some onlookers attempted to free the truck by using parts of dog cages which were in the back of the truck. They were unable to free the truck, so Steese sat in the truck and drank his beer. He then hitchhiked back to Las Vegas and from there jumped trains to Cheyenne, Wyoming.

In Cheyenne, Steese stated that he met a man named Jerome who invited him to stay with his grandparents in New Plymouth, Idaho. Steese stayed there for about one week, then left. He made his way to Elkhart, Indiana, where he called Rock. Risenhoover first contacted Steese in Elkhart.

Soules' truck and trailer were returned to his family, who flew to Las Vegas from Michigan. Soules' brother discovered a gold chain in the truck. He told the police about this chain, but they were not interested in seeing it. Soules' sister later found a pair of bloody jeans rolled in a towel under the bed in the trailer. Because the police had not wanted the chain, she assumed that they did not want the jeans either, so she disposed of them.

On October 6, 1992, Steese was charged by information with murder with the use of a deadly weapon, burglary, and grand larceny of an automobile. On October 20, 1994, Steese filed a motion to dismiss based upon alleged prosecutorial misconduct. He alleged that the prosecutor attempted to dissuade a defense witness from testifying at the upcoming trial. On November 3, 1994, the district court denied this motion.

A jury trial commenced on January 9, 1995. Steese made a motion in limine to suppress his June 18, 1992 confession on the grounds that the circumstances of the police questioning rendered the confession involuntary. A hearing on this motion was held on January 18, 1995. Steese produced a psychiatrist's report which stated that he was of low-normal intelligence and that he suffered from schizoid personality disorder. Risenhoover and Jackson were the only witnesses at the hearing on the motion in limine. The detectives' testimony showed that Steese was interrogated, with breaks, from 4 p.m. until 9:40 p.m., when he began making his transcribed confession. During this time, neither detective remembered Steese expressing hunger or weariness. He was provided with coffee, cigarettes, and snacks from a vending machine. Neither Jackson nor Risenhoover noticed any symptoms of intoxication or drug withdrawal. Based upon this hearing, the court denied Steese's motion to suppress his confession.

The case proceeded to a jury trial. Steese attempted to prove an alibi placing him in Idaho at the time of the killing. He produced a number of witnesses who testified in support of this theory. Geronimo "Coke" Bouttier ("Geronimo") testified that Steese was with him in Idaho near the beginning of June 1992. When he first testified, Curtis Bouttier ("Curtis"), Geronimo's brother, did not identify Steese as being the person in Idaho, but the next day testified that Steese had indeed been in Idaho. Curtis explained that he had been confused and self-conscious the previous day when he failed to identify Steese. Serena Bouttier ("Serena"), Curtis and Geronimo's sister, testified that Steese was in Idaho; however, she also stated that the person in Idaho had identified himself as "Robert."

In addition, Steese presented documentary evidence, including employment and social services applications, placing him in Idaho at the time of the murder. The State vigorously contested the authenticity of these documents at trial. Steese's name was misspelled on some of these documents. Experts in handwriting analysis testified that the documents were likely forged. In addition, Steese's cellmate testified that Steese admitted to the killing and bragged that his brother had set up an alibi for him in Idaho.

On March 1, 1995, the jury returned a verdict of guilty of first degree murder with use of a deadly weapon, robbery with use of a deadly weapon, burglary, and grand larceny. On April 21, 1995, the court entered a judgment of conviction and sentenced Steese. Steese stipulated to two consecutive sentences of life without the possibility of parole in exchange for the prosecution agreeing not to seek the death penalty. Pursuant to the stipulation, Steese was sentenced to two consecutive life terms for the murder and to ten years for the burglary, fifteen years for the robbery with an additional fifteen years for using a deadly weapon, and ten years for grand larceny. The burglary, robbery, and larceny sentences ran consecutively to the murder sentence.

On March 15, 1995, Steese filed a motion for a new trial or a directed verdict. The court held a hearing on April 20, 1995, and denied the motion on May 28, 1995. On June 28, 1995, Steese filed a motion to dismiss or, in the alternative, a new trial. Both these motions were based upon allegations of prosecutorial misconduct, including intimidation of defense witnesses and suppression of evidence. On September 1, 1995, the court held a hearing on this motion. On February 23, 1996, the district court issued findings of fact, conclusions of law, and an order denying this motion.

On April 21, 1995, Steese filed his notice of appeal from the judgment of conviction. On April 1, 1996, Steese filed a notice of appeal from the district court's order denying his second motion for a new trial. The State moved to consolidate these two appeals.

On April 12, 1996, this court ordered Steese to cure certain jurisdictional defects. On July 26, 1996, this court denied as moot the motion to consolidate, holding that Steese could state all grounds for appeal in his appeal from the judgment of conviction.

## DISCUSSION

First, Steese argues that his confession should have been suppressed because it was not freely and voluntarily given. He contends that because of schizoid personality disorder, drug withdrawal, lack of sleep, hunger, and a desire to please "authority figures," his will was overborne by the police interrogation. Steese also argues that the police "spoon fed" him the facts of the case so that his confession would later be corroborated. We conclude that this argument lacks merit.

A confession is admissible only if it is freely and voluntarily made. Passama v. State, 103 Nev. 212, 213, 735 P.2d 321, 322 (1987). Where the district court's determination that a confession is voluntary is supported by substantial evidence, we will not substitute our judgment for that of the district court. Brust v. State, 108 Nev. 872, 874, 839 P.2d 1300, 1301 (1989). Substantial evidence is that which a reasonable mind might consider adequate to support a conclusion. *Id.* at 875, 839 P.2d at 1301.

To determine the voluntariness of a confession, the court must look to the totality of the circumstances. *Passama,* 103 Nev. at 214, 735 P.2d at 323. Among the factors to be considered in determining whether a confession was voluntarily given are

> the youth of the accused; his lack of education or his low intelligence; the lack of any advice of constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep.

*Id.* (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226-27 (1973)). In *Passama,* we also noted that promises made by the police to a suspect are crucial to a determination of voluntariness. *Id.* at 215, 735 P.2d at 323.

In *Passama,* we concluded that the totality of the circumstances demonstrated that the defendant's confession had not been freely and voluntarily given. The defendant in *Passama* had been questioned for a number of hours, was of low-average intelligence, and had not been provided with food or drink other than coffee. In our holding, we placed particular importance on two facts: (1) that the sheriff interrogating the defendant had threatened to tell

the prosecutor if he did not cooperate; and (2) the sheriff had provided the defendant with certain facts central to the confession. *Id.* at 215-16, 735 P.2d at 324.

Steese argues that the present case is directly analogous to *Passama*. We disagree. Based upon a hearing, the district court found that the totality of the circumstances indicated that Steese's confession was freely and voluntarily given. At this hearing, Risenhoover stated that the defendant was given snacks, coffee, and cigarettes throughout the course of the interrogation. Risenhoover did not recall Steese complaining of hunger or weariness. Steese did not appear to be experiencing drug withdrawal at the time of the interrogation. Significantly, no testimony at this hearing indicated that the police had either made any promises to Steese should he confess or made threats should he fail to do so.

Steese further maintains that he was "spoon fed" the facts of the case so that his confession would fit those facts. When Steese told the police that he had killed Soules because he was about to assault Steese with a toilet plunger, they pointed out that no plunger was found at the scene. When Steese later said that he and Soules had an argument about money which escalated into the murder, Risenhoover said that this was unlikely because all the nightlights had been pulled out, indicating a burglary. While Risenhoover testified that he or Jackson had told Steese that a broken blue candle was found at the scene, Jackson recalled that Steese himself had first mentioned the candle.

However, in his confession Steese also mentioned a number of details of which the police had not informed him. He stated that Soules was nude. He stated that he covered Soules' face. He stated that he had taken a VCR, a TV, and a camera from the trailer, put them in Soules' truck, and had then driven to Lake Mead, where the truck got stuck. He stated that he attempted to free the truck by using parts from dog cages in the back of the truck. All these statements fit independently verified facts. Therefore, we conclude that unlike in *Passama*, the police in this case did not provide Steese with the key facts of his confession. Thus, we conclude that the trial court's determination that Steese's confession was freely and voluntarily given is supported by substantial evidence and that the court did not err in denying Steese's motion to suppress his confession.

Second, Steese contends that the district court erred in denying

his motions to dismiss and for a new trial on the grounds that the prosecution attempted to influence the testimony of Nadine Pollock ("Pollock"), one of his alibi witnesses. Specifically, Steese contends that the prosecutor overstated the strength of the case to Pollock prior to trial.

The district court's denial of a motion for new trial will not be reversed absent an abuse of discretion. Lightford v. State, 91 Nev. 482, 483, 538 P.2d 585, 586 (1975). In Rippo v. State, 113 Nev. 1239, 1251, 946 P.2d 1017, 1025 (1997), we held that witness intimidation by a prosecutor warrants a new trial if it results in a denial of the defendant's due process right to a fair trial. Although the misconduct which Steese alleges here does not rise to the level of intimidation, we conclude that the holding of *Rippo* applies with equal force to cases where a prosecutor attempts to dissuade a witness from testifying by misrepresenting the facts of the case.

On October 20, 1994, Steese filed a motion to dismiss based upon alleged prosecutorial misconduct. Steese supported this motion with an affidavit in which Pollock stated that William Kephart ("Kephart"), the prosecuting attorney, had telephoned her and asked her why she was testifying for the defense, given the fact that Steese had confessed and that "Steese's fingerprints were on the murder weapon" and all over Soules' home. In addition, Pollock stated that Kephart told her that Steese was wanted for felonies in six states and that witnesses had seen Steese commit the murder.

On November 3, 1994, the State filed its opposition to this motion. The State supported its opposition with an affidavit by Kephart. In this affidavit, Kephart stated that he had indeed spoken with Pollock and told her that Steese had confessed and that he was wanted for felonies around the country. However, Kephart specifically recalled telling Pollock that the murder weapon had not been found. Kephart also stated that he did not tell Pollock that there were eyewitnesses to the murder. On November 3, 1994, the district court issued an order denying Steese's motion. Steese again raised this argument in his motions for a new trial, which the court also denied.

We conclude that the facts in the record do not support Steese's argument. The affidavit testimony, while conflicting, was sufficient to support the district court's ruling. Furthermore, Steese was not prejudiced by the prosecutor's alleged misconduct. Pollock testified at trial as an alibi witness on Steese's behalf. Therefore, we conclude that the district court did not abuse its discretion by denying Steese's motion to dismiss.

Third, Steese argues that the police committed prejudicial misconduct by failing to preserve material evidence. After Soules' truck and trailer were returned to his family, his brother found a gold chain, which belonged to Soules, inside the truck. He informed the police of this, but they were "not concerned." Later, Soules' sister found a pair of blood-soaked jeans wrapped in a towel underneath the bed in the trailer. Assuming that the police "had done their job," Soules' family simply disposed of the jeans.

Due process requires the State to preserve material evidence. State v. Hall, 105 Nev. 7, 9, 768 P.2d 349, 350 (1989). However, this presupposes that the State has possession and control of the evidence at issue. *See* March v. State, 859 P.2d 714, 716 (Alaska Ct. App. 1993) (holding that the State's duty to preserve evidence attaches at the time the State has gathered and taken possession of the evidence). Here, the police never had control of this evidence. Therefore, Steese is essentially arguing that the State denied him due process by failing to gather evidence.

In Daniels v. State, 114 Nev. 261, 956 P.2d 111 (1998), we adopted New Mexico's approach to claims of failure to gather evidence. In State v. Ware, 881 P.2d 679 (N.M. 1994), the New Mexico Supreme Court set forth a two-part test for determining whether police violate due process by failing to gather evidence. First, the evidence which the police failed to gather must be constitutionally material. Evidence is material when there is a reasonable probability that had the evidence been available to the defense, the result of the proceeding would have been different. If the evidence is material, the second inquiry concerns the good faith of the police. If the police acted in bad faith or were grossly negligent in failing to gather the evidence, then the trial court may instruct the jury that the material evidence not gathered from the crime scene would be unfavorable to the State. *Id.* at 685 (citing, *inter alia,* United States v. Bagley, 473 U.S. 667, 682 (1985), and State v. McGill, 324 N.W. 2d 378 (Minn. 1982)).

In the present case, we conclude that Steese has not shown that the gold chain and bloody jeans were constitutionally material. Steese's conviction was based primarily upon his confession, which was corroborated by the known physical evidence. Based upon this evidence, the jury determined beyond a reasonable doubt that Steese had murdered Soules. While Steese alleges in his brief that testing of the blood on the jeans may have excul-

pated him, he has failed to point to any facts in the record which support this. We conclude that Steese's naked speculation is insufficient to show that a different result was likely at trial had the police located this evidence. Therefore, we conclude that this evidence was not constitutionally material.[3]

Steese makes an identical argument with regard to the gold chain which Soules' brother found in Soules' truck. Steese argues that "the jewelry possibly retained human hair [and] body fluids subject to DNA testing." However, we conclude that the materiality requirement of *Ware* is simply not met by Steese's naked speculation. Therefore, we conclude that the police did not violate Steese's right to due process by failing to discover the bloody jeans or to examine the gold chain.

Fourth, Steese argues that the State violated his due process rights by failing to produce certain allegedly exculpatory evidence. Specifically, Steese alleges that the State failed to disclose that Curtis, one of his alibi witnesses, had previously identified him in a photographic line-up.

In November 1994, Curtis was shown a photographic line-up, which included Steese and his brother, Robert. Curtis identified Steese as being the person whom he had seen in Idaho in the first part of June 1992. When asked at trial to identify the person from Idaho, Curtis was at first unable to identify Steese. Steese argues that, had he known of the previous photographic identification, he could have immediately rehabilitated Curtis, strengthening his alibi defense.

Due process requires the State to disclose material evidence favorable to the defense. Brady v. Maryland, 373 U.S. 83, 87 (1963). Evidence is material when there is a reasonable probability that had the evidence been available to the defense, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 678.

We conclude that there is no reasonable probability that had this evidence been available to the defense at trial, the result at trial would have been different. The State's case against Steese

---

[3]Moreover, even if material, there is no evidence that the police acted in bad faith or were grossly negligent in failing to find the jeans. At least two police officers, Risenhoover and Neilson, looked through the trailer for evidence and did not find the jeans. Indeed, Soules' family discovered the jeans only when the trailer was professionally cleaned. At no point did Soules' family notify the police of the existence of this evidence. This merely suggests that the police failed to search every dark corner of the trailer for evidence; it does not imply they acted in bad faith or with gross negligence.

was strong. Steese's confession was well corroborated by the facts of the case. During his confession, Steese stated that he had stabbed Soules over one hundred times; that Soules body was nude; that he had covered Soules' face after the murder; that he had stolen Soules' television, VCR, and camera; that he had driven away in Soules' truck; that the truck had gotten stuck near Lake Mead; and that he had attempted to use dog cages to free the truck. There is no indication in the record that Steese could have learned these facts from news reports of the murder. All these statements were corroborated by the police investigation. Furthermore, Steese's cellmate testified that Steese had told him that Steese's brother, Robert, was in Idaho manufacturing an alibi. Serena testified that the person in Idaho had introduced himself to her as Robert, which is the name of Steese's brother. Given the strength of this evidence against Steese, we conclude that in all reasonable probability, the jury would have reached the same verdict had Steese been aware of Curtis' previous identification. Therefore, we conclude that the evidence at issue was not constitutionally material and that Steese's due process rights were not violated by the State's failure to give Steese this evidence.

Fifth, Steese argues that the district court erred by denying his motions to dismiss and for a new trial on the grounds that the State had failed to disclose certain phone records which allegedly placed Steese in Idaho at the time of the murder and had discouraged Rock from speaking to the defense. Steese posits that the phone records showed that Steese had called Rock from Nampa, Idaho, once on June 3, 1992 (the day of the murder) and three times on June 5, 1992. Steese further alleged that the prosecution discouraged Rock from speaking with defense counsel before trial, thereby preventing the defense from learning that Rock had spoken with Steese on those days. Steese asserts that Rock would have testified that because of Steese's accent and the content of the conversation, Rock was certain that he spoke with Steese, and not his brother, on June 3 and 5, 1992.

Steese supported his motion in the district court with photocopies of the phone records and a detailed affidavit by Rock. In this affidavit, Rock stated that he had been interviewed by Kephart and Doug Herndon ("Herndon"), the prosecutors in this case. Rock told Kephart and Herndon that he did not remember Steese telling him that Soules had been stabbed "over 100 times." Rock asserted that the prosecutors became very upset with him at this point and a "yelling match" occurred. Rock also stated that "[a]lthough Kephart indicated that it was technically

OK for me to talk to defense counsel, he gave me rather clear indications that it would be best if I did not."

Rock further averred that he had spoken with Steese on May 21, 1992, when Steese gave him Soules' address. Rock then stated:

> The next time I heard from [Steese] was when he called me collect from Nampa, Idaho, early in the morning of June 5, 1992. . . . He said that he was with a girl, and that he [and] the girl . . . had been out partying the night before. . . .
>
> In addition to the fact that I recognized [Steese's] voice, I know that the June 5, 1992 collect calls from Nampa were made by [Steese] because we talked about things that only [Steese] and I would have knowledge of. Specifically, I remember [Steese] apologizing for the fact that he had slept with and/or fooled around with the girl from whose house he was calling. . . . There is no chance that anyone other than [Steese] would have made comments of this nature to me. . . .

In this affidavit, Rock seems to deny that Steese and he had a sexual relationship, stating that "[w]e contemplated the idea of having a relationship, yet we knew that it would probably not work." However, the letter which Rock had written to Steese, in care of Soules, seems to indicate that the two did, in fact, have such a relationship.

In the State's opposition to Steese's motion for a new trial, the State asserted that neither Herndon nor Kephart made any attempt to discourage Rock from testifying at trial. The State supported its arguments with affidavits by Herndon and Kephart, both of whom stated that they had made no attempt to dissuade Rock from testifying or from speaking with defense counsel.

On September 1, 1995, the district court heard oral argument on the motion. The court did not hear additional testimony on the matter; it reached its decision based upon the record and upon the affidavits submitted with the parties' briefs. On February 23, 1996, the court issued findings of fact, conclusions of law, and an order denying Steese's motion.

Upon a thorough review of the affidavits and other documentary evidence, we conclude that the district court did not err in denying Steese's motion for a new trial. First, the phone records and Rock's affidavit testimony do not place Steese in Nampa, Idaho, on June 3, 1992. Rock testified that he recalled receiving a phone call from Steese on June 5, 1992, two days *after* the murder. Although the phone records show another collect call to Rock on June 3, 1992, Rock explicitly stated in his affidavit that

the phone call of June 5, 1992, was the first time he heard from Steese since receiving a postcard on May 21, 1992.

Furthermore, *Brady* does not require the State to disclose evidence which is available to the defendant from other sources, including diligent investigation by the defense. Stockton v. Murray, 41 F.3d 920, 927 (4th Cir. 1994); *accord* United States v. Davis, 787 F.2d 1501 (11th Cir. 1986). Here, Steese certainly had knowledge of the collect calls he allegedly made to Rock. Through diligent investigation, defense counsel could have obtained the phone records independently. Therefore, we conclude that the State did not violate *Brady* by failing to provide these records to the defense.[4]

Steese additionally contends that the State pressured Rock to avoid contact with defense counsel. After evaluating the evidence Steese presented to support his motion for a new trial, the district court found that Rock had not been told to avoid speaking with Steese's attorney. This court will not set aside a district court's findings of fact unless such findings are not supported by substantial evidence. *See* Ford v. State, 105 Nev. 850, 854, 784 P.2d 951, 953 (1989).

Here, the district court's finding was based upon substantial evidence. In Rock's affidavit, he stated that the prosecution indicated that Rock should not speak with defense counsel. Both prosecutors who were working on the case executed affidavits in which they specifically denied that any attempt had been made to persuade Rock not to speak to defense counsel. In fact, defense counsel actually did speak with Rock prior to trial. However, for reasons which are not clear, Rock terminated this conversation. Moreover, Rock was subject to impeachment by a showing of bias; at the very least, Rock had tender feelings for Steese and

---

[4]Our dissenting colleagues argue that Rock's "complete refutation" of a police officer's statement at trial was constitutionally material. At trial, Risenhoover testified, "I had learned that [Steese] had said that Soules had been stabbed over a hundred times." In his affidavit, Rock states that in January 1995, prior to trial, he told the police that he did not remember Steese making this assertion. However, a witness' inability to recall a statement made two and one-half years before is a far cry from a "complete refutation" of the fact that the statement had been made.

The dissent also points out that Rock stated in his affidavit that all the collect phone calls he received in June 1993 were from Steese, and thus, the June 3 call must have been from Steese. However, this general assertion on Rock's part contradicts his specific recollection that "[t]he next time I heard from [Steese] was when he called me collect . . . early in the morning of June 5, 1992. Therefore, we conclude that this statement only serves to further undermine Rock's credibility.

was likely his lover. Rock could also have been impeached by a showing that he made a number of conflicting statements throughout the course of the investigation. We conclude that this evidence, though conflicting, substantially supports the district court's conclusion.

We conclude that given the strength of the State's case and the weakness of the evidence and witness testimony at issue here, the outcome at trial would, in all reasonable probability, have been the same even if the phone records and Rock's allegations had been presented by the defense at trial.

Sixth, Steese argues that the State somehow persuaded two witnesses, Moore and Alexander Koulapaev ("Koulapaev"), to alter their testimony on the eve of trial. Steese bases this contention upon certain discrepancies between the statements which Moore and Koulapaev gave the police and the testimony of these witnesses at trial. However, Steese fails to point to any evidence which suggests that the action on the part of the prosecutor caused this change in testimony. Thus, Steese seems to imply that a change in testimony favoring the State is prima facie evidence of witness tampering. Steese provides no legal authority to support this position. Therefore, we need not consider this argument. *See* Cunningham v. State, 94 Nev. 128, 130, 575 P.2d 936, 938 (1978).

Seventh, Steese argues that the prosecutor made certain comments during closing argument which were so unfairly prejudicial as to constitute reversible error.

The United States Supreme Court has noted that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be reviewed in context." United States v. Young, 471 U.S. 1, 11 (1984). In general, a defendant's failure to object or to request a curative jury instruction precludes appellate review of such comments. Ross v. State, 106 Nev. 924, 928, 803 P.2d 1104, 1106 (1990). Furthermore, in order for prosecutorial misconduct to constitute reversible error, it must be prejudicial and not merely harmless. *Id.* Error is harmless if this court concludes, "without reservation that the verdict would have been the same in the absence of error." Witherow v. State, 104 Nev. 721, 724, 765 P.2d 1153, 1156 (1988).

Steese asserts that the prosecutor committed reversible misconduct under Collier v. State, 101 Nev. 473, 705 P.2d 1126 (1985), by stating that a guilty verdict was the only one which "this

community would condone.'' We conclude that this case is distinguishable from *Collier*.

The prosecutor in *Collier* argued that "prison doesn't rehabilitate," and implied that if the defendant was not sentenced to death, he was likely to kill again, just as had Patrick McKenna, a criminal of considerable local infamy. The prosecution also stated that "keeping Gregory Collier in prison for life at a cost to taxpayers of $35,000.00 per year isn't worth it," (*id.* at 481, 705 P.2d at 1131), and that "[i]f we are not angry with him, the implication is that we are not a moral community" (*id.* at 479, 705 P.2d at 1129). Furthermore, at one point the prosecutor melodramatically turned to the defendant and stated, "Gregory Alan Collier, you deserve to die." *Id.* at 480, 705 P.2d at 1130. We concluded that the cumulative effect of these statements was so prejudicial as to warrant reversal of the death sentence.

In the present case, the prosecutor's single reference to "the community" simply did not approach the level of rhetorical excess discussed in *Collier*. Therefore, we conclude that this comment did not constitute prosecutorial misconduct.[5]

Eighth, Steese contends that his conviction was impermissibly based entirely upon his uncorroborated confession. We conclude that this argument has no foundation in the record; therefore, we need not reach the legal merits of the issue. As discussed above, Steese's confession was well corroborated by all the facts which the police investigation had previously revealed. Therefore, we conclude that this argument is factually meritless.

Ninth, Steese posits that the district court committed reversible error by allowing Moore to testify that he had seen Steese with Soules on the night of the murder. Steese bases this argument on the fact that Moore's descriptions of the people he saw with Soules on that evening do not match Steese's appearance at the time of trial. Steese contends that Moore identified him in court only because he had previously been shown a photographic line-up which, he argues, was impermissibly suggestive. Steese further asserts that only after seeing a photograph of Steese in this line-up was Moore able to identify him in court.

Steese argues that the photographic line-up shown to Moore was impermissibly suggestive because his photograph was the only one which was labeled with a 1992 booking date. However, this court has held that "mere disparity in the dates on photo-

---

[5]Steese argues that a number of other comments made by the prosecutor during closing argument constitute misconduct. Because the defense failed make a contemporaneous objection to these comments at trial, we decline to consider them on appeal. *Ross*, 106 Nev. at 928, 803 P.2d at 1106.

graphs is not sufficient to invalidate a photographic line-up." Lamb v. State, 96 Nev. 452, 454, 611 P.2d 206, 206 (1980). Therefore, we conclude that Moore's identification of Steese in the photographic line-up was valid.

Absent the argument that Moore's identification of Steese was based upon an invalid photographic line-up, Steese's contention is essentially that Moore's in court identification of Steese should have been suppressed because Steese did not match the description which Moore gave to the police the day after the murder. Moore told police that he had seen Soules with someone about 5'8"-5'9" tall, weighing 160-170 pounds, with thinning reddish or brownish hair. When Steese was apprehended, he weighed 140 pounds, with a full head of brown hair. Because of this disparity, Steese argues, Moore's identification was highly suspect and should have been ruled inadmissible.

"The weight and credibility of eyewitness testimony is solely within the province of the jury." Wise v. State, 92 Nev. 181, 183, 547 P.2d 314, 315 (1976). Here, Steese was presumably aware at the time of trial of Moore's description of the person accompanying Soules. Steese had an opportunity to cross-examine Moore regarding the disparity between Steese's appearance and the description he gave to the police. Therefore, we conclude that any inconsistency created by Moore's identification of Steese was appropriately resolved by the jury's evaluation of Moore's credibility.

Tenth, Steese argues that the trial court erred in instructing the jury that a knife is a deadly weapon for purposes of the sentence enhancement statute.

This court has held that a deadly weapon, for purposes of NRS 193.165, "is any instrumentality which is inherently dangerous." Zgombic v. State, 106 Nev. 571, 576, 798 P.2d 548, 551 (1990). A weapon is inherently dangerous if the weapon, "when used in the ordinary manner contemplated by its design and construction, will, or is likely to, cause a life threatening injury or death." *Id.* In *Zgombic,* the court anticipated three categories of weapons: ones which were dangerous as a matter of law, weapons which were not dangerous as a matter of law, and those for which the question of inherent dangerousness had to be submitted to the jury. *Id.* at 577, 798 P.2d at 551-52. The trial court in the present case instructed the jury that a knife is a deadly weapon. Thus, the court implicitly determined that the knife was, as a matter of law, an inherently dangerous weapon.

We have never explicitly held that a kitchen knife like the one at issue here is an inherently dangerous weapon. However, in Hutchins v. State, 110 Nev. 103, 111, 867 P.2d 1136, 1141 (1994), we held that scissors were not inherently dangerous because, in contrast to knives, which "are often designed as weapons and have been so used throughout history," scissors "are more analogous to tools . . . which are *potentially* harmful when misused." *Id.* Therefore, we conclude that under *Zgombic* and *Hutchins*, at least some knives are inherently dangerous weapons.

Steese stated in his confession that the knife which he used was "a butcher's knife that you use to cut meat [with a] blade length of five to seven inches." We conclude that a large kitchen knife such as this is the type of knife to which *Hutchins* was referring. Therefore, we conclude that the trial court did not err in instructing the jury that a knife is a deadly weapon as a matter of law.[6]

Eleventh, Steese argues that Herndon and Kephart were potential witnesses in the case and therefore ought to have been disqualified due to a conflict of interest. SCR 178 provides that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness." Thus, if either Herndon or Kephart was likely to be a necessary witness, he should have been disqualified.

Steese argues that the prosecutors were potential witnesses in three respects. First, as discussed earlier in this opinion, he alleges that the prosecution team administered an impermissibly suggestive photographic line-up to Moore. Steese argues that he could have fully impeached Moore by calling either Herndon or Kephart as a witness to the circumstances of the identification. Second, Steese claims that Kephart became a potential witness when he conducted an investigative interview with Mary Clark ("Clark"), another witness. Finally, Steese argues that Kephart became a witness when he allegedly attempted to dissuade Pollock from testifying.

Upon a review of the record, we conclude that the activity at issue here did not go beyond the bounds of necessary pretrial investigation and preparation. We decline to hold that prosecutors should be disqualified on the basis of such investigation. Furthermore, we conclude that Steese was not prejudiced by these

---

[6]We note that the rule enunciated in *Zgombic* was superseded in 1995 by a legislative modification of NRS 193.165(5) which provides a broader definition of "deadly weapon" than that of *Zgombic*. However, as Steese was convicted under the previous statute, we apply the *Zgombic* test to this case.

alleged conflicts. Steese had an opportunity to cross-examine Moore as to the circumstances of the photographic line-up. Neither Steese's brief nor the record sets forth any facts regarding the nature of Kephart's interview of Clark; therefore, we are unable to evaluate whether he was prejudiced by this. Finally, as discussed above, even if Kephart did attempt to dissuade Pollock from testifying, this was clearly not prejudicial; Pollock testified as an alibi witness for Steese. Therefore, we conclude that the trial court did not commit error by failing to disqualify Kephart and Herndon.

Twelfth, Steese asserts that the district court erred by allowing witnesses to testify as to a number of unspecified hearsay statements. However, Steese fails to name the witnesses or show the location of these alleged hearsay statements by citing to the record. Furthermore, Steese does not set forth the legal basis for his conclusion that these statements constituted inadmissible hearsay. Therefore, we decline to consider this issue on appeal.

We conclude that none of Steese's arguments on appeal has merit. Therefore, we affirm the judgment of the district court.

SHEARING and MAUPIN, JJ., concur.

ROSE, J., with whom SPRINGER, C. J., joins, dissenting:

A strong showing has been made by the defense indicating that the State withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). Because of the material nature of such evidence, I conclude that Steese's conviction should be reversed and that he be afforded a new trial.

In *Brady,* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). The *Bagley* Court further concluded that a defendant's due process rights could be violated even where the defendant did not request such evidence. 473 U.S. at 682. Further, once a reviewing court has identified constitutional error pursuant to *Bagley,* a new trial is warranted without additional harmless error analysis. Kyles v. Whitley, 514 U.S. 419, 435, 115 S. Ct. 1555, 1566 (1995).

During the days prior to trial, the State flew witness Richard Rock from his home in Pennsylvania to Las Vegas to confer about his relationship and telephone calls with Steese. After conferring with Rock, the deputy district attorneys sent him back to his

home to secure from the telephone company copies of his telephone records and return immediately with them to Las Vegas. This Rock did.

The telephone records were important because Steese claimed that he was in Idaho when the murder occurred on the evening of June 3rd or early June 4th. Rock stated in his affidavit that he had telephone conversations with Steese, who was in Idaho at about that time. The deputies reviewed the telephone records, talked further with Rock, told him he was not needed as a witness, and that he should return home. While Rock spoke briefly on the telephone with Steese's defense counsel the night prior to his departure, Rock stated in his affidavit that he was pressured to avoid any communication with Steese's defense counsel.

Both the prosecutor and Rock knew that the defense attorney wanted to speak with Rock. Pressuring an important witness to avoid communicating with defense counsel, where the State is seeking the death penalty, strikes me as unfair and "sharp" practice by the prosecutors.

The State was obligated to disclose two items of information received from Rock. First, the telephone records indicate that two collect telephone calls were placed from Nampa, Idaho to Rock. One of the calls was placed on June 3rd and the other call was placed on June 5th. While Rock stated in his affidavit supporting the defense motion for a new trial that he believed the first collect call he received from Steese in Idaho was on June 5th, he also stated that "I can say with a great degree of certainty that *all* of the collect calls which appear on my phone bills for May and June of 1992 were made by Fred Steese, aka Fred Burke." (Emphasis added.) This provided strong evidence that Steese was in Idaho at the time of the murder as he claimed; however, the prosecutors sent the witness home without notifying the defense of these facts or the telephone records. The State had the clear obligation to produce the phone records for the defense because they were exculpatory and bolstered Steese's defense theory. Assuming Rock told the prosecutors that the collect telephone calls were from Steese as he declares in his affidavit, the State also had an obligation to present this exculpatory statement to the defense.

The second item of information the State did not disclose to the defense also came from Rock. This was Rock's statement that he did not recall Steese telling him that the victim had been stabbed one hundred times, and that he did not convey this information to the Las Vegas detectives. This was an important fact to the State because the detectives testified that Rock told them that he had heard this from Steese, and Steese could have only received this

information from the crime scene itself, because the number of stab wounds was never made public.

The State made much of the fact that Steese knew the victim had been stabbed numerous times, although such information had never been made public. While testifying during trial, Detective Jackson stated that "I had learned that [Steese] had said that [the victim] had been stabbed over a hundred times." Information pertaining to Rock's complete refutation of this comment would have been extremely helpful to the defense in examining the detective and, if necessary, calling Rock to disavow hearing this from Steese and telling it to Detectives Jackson and Scroggin. In his affidavit, Rock specifically stated that he informed the prosecutors that he had never made this comment and they became angry with him for so doing.

While the deputy district attorneys generally refute the assertions that they did anything improper, they do not specifically deny the above stated facts about the telephone calls and the victim being stabbed one hundred times. Even if they were to refute these facts, the State had an obligation to inform the defense of any exculpatory information received and, at the very least, this included the telephone records and Rock's recantation of ever conveying the "one-hundred stabs" information.

I conclude that excluding such evidence from the trial made the jury verdict unreliable and uncertain as to what the result would have been had this information been produced, and I would reverse. *See Kyles,* 514 U.S. 419, 115 S. Ct. 1555 (1995). At the very least, I would remand this case for a full evidentiary hearing on the issues presented by the motion for a new trial. When critical facts are in dispute, issues should be decided by testimony given under oath and followed by cross-examination, not on affidavits. Rock's affidavit directly conflicted with some of the statements made by the deputy district attorneys and it is unclear whether Rock informed the deputies of all the facts stated in his affidavit. A remand for an evidentiary hearing would ensure that all important facts were disclosed and the district judge could assess the credibility of the witnesses and the strength of their factual assertions. Therefore, I must respectfully dissent.