JONATHAN DANIELS, Appellant, *v.* THE
STATE OF NEVADA, Respondent.

No. 28098

April 2, 1998                                         956 P.2d 111

*Steven McGuire*, State Public Defender; *Jordan S. Savage*, Deputy Public Defender, Carson City, for Appellant.

*Frankie Sue Del Papa*, Attorney General, Carson City; *Stewart L. Bell*, District Attorney, *James Tufteland*, Chief Deputy District Attorney, Clark County, for Respondent.

**OPINION**

*Per Curiam:*
Appellant Jonathan Daniels fatally shot two convenience store

clerks during a robbery in Las Vegas, Nevada. Daniels and his companion, Kenya Ennis, visited the home of Francine Banks on January 20, 1995. Ennis asked Banks to drive her and Daniels to the AM/PM Mini-Market located one block from the apartment building in which Banks and Ennis both resided so that Daniels and Ennis could use the public telephone. Banks' boyfriend, Maurice Marshall, drove Banks, Daniels, Ennis, and Ennis' two children to the AM/PM Mini-Market. Ennis and Marshall later testified that Daniels and Ennis did not use the telephone at the AM/PM Mini-Market because Daniels was afraid that some unspecified people "were out to get him." At Daniels' and Ennis' request, Marshall drove them to a nearby Circle K Market so that they could use the telephone there instead.

After Daniels and Ennis used the public telephone at the Circle K Market, Marshall drove them back to the AM/PM Mini-Market that they had visited earlier. Marshall testified that he drove Daniels and Ennis back to the AM/PM Mini-Market at their request so that they could make another telephone call, but Ennis testified that Marshall suggested returning to the AM/PM Mini-Market so that he could get more gas. Upon arrival at the AM/PM Mini-Market, Daniels and Marshall entered the store.

Marshall testified that he entered the store for the sole purpose of paying for gas, but that Daniels grabbed the female clerk, June Frye, by the neck and drew a gun immediately after entering the store. Frye opened the cash register in response to Daniels' demands, and Daniels then began to take the money from the register. As Daniels was preparing to exit the store, the male clerk, Nicasio Diaz, took a step toward Daniels and said, "[M]an, just give me the gun." Daniels told Diaz not to take another step, but Diaz continued to approach Daniels, repeating his request for Daniels to give up the gun. Daniels then shot Diaz in the chest, and as Diaz fell to the ground, Frye and Marshall turned and ran toward the back of the store. Daniels then fired another shot, and Marshall saw Frye fall to the ground. Ennis entered the store and began to yell at Daniels, but he ordered her to go back to the car, and he followed her to the car immediately thereafter.

Daniels drove Marshall's car, with Ennis and her two children as passengers, until the car ran out of gas. At that point, Ennis called a taxi cab, which took Daniels, Ennis, and her two children to the home of Daniels' aunt. Daniels told his aunt, mother and cousin about the shooting, and, concerned about Daniels' mental state, they summoned an ambulance for Daniels shortly thereafter. Daniels' sister, Ladonna Daniels, testified that the ambulance would not transport Daniels to the hospital, so she, Daniels' aunt, and a friend of Daniels drove Daniels to the

University Medical Center ("UMC") because "[h]is eyes were bulgy like and he was just mumbling . . . [and staring] like he was off in space somewhere." Daniels' sister testified that the wait at UMC was too long, so they drove to Valley Hospital, but then left Valley Hospital before Daniels was examined, dropped Daniels' aunt off at her home, and were on their way to an out-patient clinic when they were stopped by the police.

Daniels confessed to the shooting of the AM/PM Mini-Market clerks in a tape-recorded statement to Las Vegas Metropolitan Police Department Detective Donald Tremel at 3:49 a.m. on January 21, 1995. Prior to Daniels' statement, Detective Tremel had received a copy of the UMC record showing that Daniels had complained of "drugs in system" when he signed in prior to his arrest. The detective had also been informed that Marshall and other witnesses described Daniels as appearing to be under the influence of drugs. Detective Tremel testified that, before the tape was started, Daniels admitted to smoking marijuana on the day before the shootings, but denied any other recent drug use, and did not appear to be under the influence of drugs at the time of the interview. In Daniels' interview, he was not asked about whether he had been under the influence of any intoxicating substance and did not volunteer any such information.

Daniels' initial medical screening report, prepared by a nurse at the Clark County Detention Center, indicates that Daniels denied any drug use and did not behave abnormally. Detective Tremel testified that either one or two days after the tape-recorded interview, Daniels spoke with the nurse who had conducted his initial medical screening and asked to be tested for drugs. The nurse reported Daniels' request to Detective Tremel, but the detective did not order drug testing for Daniels.

On January 22, 1995, Daniels spoke with several police officers, who were not previously involved with his case and told them that he had ingested phencyclidine ("PCP") about one hour before the shooting incident.

At Daniels' trial, Dan Berkabile, a forensic chemistry expert, testified that PCP can cause euphoria lasting up to four hours, hallucinations, "loss of awareness of the surroundings," and "confusion about one's self and what one is doing." Berkabile also testified that PCP can be detected in someone's system using samples of either urine, hair, or blood, but that blood samples would only be useful for testing if drawn within "a few hours" of ingestion. John Hiatt, a toxicology expert, testified that Daniels' hair tested positive for both cocaine and PCP on March 1, 1995. Hiatt also testified that the hair test proved only that Daniels had used cocaine and PCP within the ninety-day period preceding the test, whereas a blood test could have determined whether Daniels had ingested the drugs within several hours preceding the test.

Based on the State's failure to gather blood evidence that might have proven that Daniels was under the effects of PCP at the time of the shootings, Daniels filed a motion to dismiss the indictment, or, in the alternative, to suppress his confession, and for a finding that Daniels must be conclusively presumed to have lacked the specific intent for first-degree murder as a matter of law. The district court denied the motion, and also denied Daniels' subsequent pre-trial petition for a writ of habeas corpus based on the State's alleged failure to provide adequate notice, pursuant to Sheriff v. Marcum, 105 Nev. 824, 783 P.2d 1389 (1989), of its intent to initiate grand jury proceedings.

After trial, the jury found Daniels guilty of two counts of first-degree murder with use of a deadly weapon and two counts of robbery with use of a deadly weapon. For each murder conviction, the jury imposed a sentence of life without the possibility of parole plus an additional term of life without the possibility of parole for the weapon enhancement. For each robbery conviction, the jury imposed a sentence of fifteen years plus an additional fifteen years for the weapon enhancement. All sentences are to run concurrently.

## Failure to gather blood evidence

Although Daniels characterizes the State's inaction as a failure to preserve evidence, his claim of error actually relates to the State's failure to *gather* blood evidence from Daniels immediately following his arrest. Daniels admitted to shooting the AM/PM Mini-Mart clerks, but relied on a voluntary intoxication defense to negate the element of specific intent. Daniels argues that he could have proven that he was intoxicated when he shot the clerks if the State had taken a blood sample for testing. Daniels' expert testified that a blood test would have helped to determine whether Daniels had ingested PCP within several hours preceding his arrest.[1]

In relying on case law involving the failure to preserve evidence, Daniels fails to distinguish between collection and preservation of evidence. Had the State gathered blood evidence from Daniels and then allowed it to be lost or failed to deliver it to Daniels' counsel, his argument would be more tenable. The

---

[1]The jury does appear to have considered Daniels' claimed intoxication and witnesses' accounts of his strange behavior, as evidenced by its finding of several mitigating circumstances. These include findings that the murders were committed "while the defendant was under the influence of extreme mental or emotional disturbance," while the defendant was under "duress," and "any other mitigating circumstances."

State's failure to preserve potentially exculpatory evidence may result in dismissal of the charges if the defendant can show "bad faith or connivance on the part of the government" or "that he was prejudiced by the loss of the evidence." Howard v. State, 95 Nev. 580, 582, 600 P.2d 214, 215-216 (1979) (citations omitted).

Although this court has not previously articulated a rule specifically governing the present situation, some states have been reluctant to impose a duty to gather exculpatory evidence. *See, e.g.,* March v. State, 859 P.2d 714, 716 (Alaska Ct. App. 1993) ("Officers investigating a crime need not 'track down every conceivable investigative lead and seize every scintilla of evidence regardless of its apparent importance . . . or run the risk of denying a defendant due process . . . .' " (quoting Nicholson v. State, 570 P.2d 1058, 1064 (Alaska 1977))); State v. Rivera, 733 P.2d 1090, 1095 (Ariz. 1987) ("The State has no corresponding duty, however, to gather blood alcohol evidence for the defense to use in corroborating the defense's *own* evidence."); State v. Steffes, 500 N.W.2d 608 (N.D. 1993) (state has no duty to collect particular evidence at the crime scene).

At least one court, recognizing that injustices could arise from the State's failure to gather evidence under certain circumstances, has developed a test for failure to gather evidence. In State v. Ware, 881 P.2d 679 (N.M. 1994), the New Mexico Supreme Court established a two-part test. The first part requires the defense to show that the evidence was "material," meaning that there is a reasonable probability that, had the evidence been available to the defense, the result of the proceedings would have been different. *Id.* at 685; *see* United States v. Bagley, 473 U.S. 667 (1985). If the evidence was material, then the court must determine whether the failure to gather evidence was the result of mere negligence, gross negligence, or a bad faith attempt to prejudice the defendant's case. *Ware,* 881 P.2d at 685-686. When mere negligence is involved, no sanctions are imposed, but the defendant can still examine the prosecution's witnesses about the investigative deficiencies. *Id.* When gross negligence is involved, the defense is entitled to a presumption that the evidence would have been unfavorable to the State. *Id.* In cases of bad faith, we conclude that dismissal of the charges may be an available remedy based upon an evaluation of the case as a whole.[2]

---

[2]The *Ware* court concluded that, in cases of bad faith, "the trial court may order the evidence suppressed." *Id.* Of course, suppression of potentially exculpatory evidence that was not gathered in the first place is both impossible in fact and nonsensical in theory. Even if the evidence was available for suppression, this sanction would disadvantage the defendant rather than the State. Accordingly, we presume that this language from *Ware* is in error, and believe that dismissal of the charges would be the most appropriate measure under the circumstances.

We agree with the *Ware* court's conclusion that, although "police officers generally have no duty to collect all potential evidence from a crime scene . . . this rule is not absolute." *Id.* at 684. Accordingly, we approve of the approach articulated in *Ware*, and adopt a similar standard for Nevada. Despite this decision, we must deny Daniels' appeal because he failed to establish that the blood evidence was likely to have been material, and because he failed to establish that the State's failure to gather the blood evidence was attributable to negligence, gross negligence, or bad faith.

The prosecution does not address the exculpatory potential of the blood evidence; however, we conclude that whether the blood evidence would likely have prevented Daniels' conviction is pure speculation. By Daniels' own admission, he was not arrested until about six hours after his alleged ingestion of PCP. Daniels' expert testified that PCP can only be detected in the blood for "a few hours" after ingestion. Thus, if the test did indicate the presence of PCP, it would not prove beyond mere speculation that Daniels ingested the drug before the shootings.

Although we need not reach the second part of the prescribed analysis in light of our conclusion that the first prong of the *Ware* test has not been satisfied, we note that Daniels also failed to establish that the State's failure to gather blood evidence was caused by negligence, gross negligence, or bad faith. Daniels emphasizes that Detective Tremel declined to order blood tests on the morning of Daniels' arrest despite his awareness that Marshall and other witnesses had described Daniels' strange appearance and behavior. However, the detective was also aware that the nurse who performed Daniels' initial medical screening did not notice any signs that Daniels was under the influence of drugs, and Daniels told her that he had not taken any drugs. Furthermore, the detective testified that, prior to the tape-recorded interview, Daniels admitted to smoking marijuana the previous day, but denied any other recent drug use. We conclude that a reasonable jury could not find that the detective was negligent, grossly negligent or acted in bad faith by deferring to the nurse's professional judgment and Daniels' own assertions that he was not intoxicated.

*Alleged constitutional violations*

Daniels argues that the State violated his constitutional rights

to due process, liberty, and equal protection of the law by prosecuting him for first-degree murder, despite his claimed voluntary intoxication. Daniels compares operation of a firearm while intoxicated to operation of a motor vehicle while intoxicated, and notes that when a voluntarily intoxicated defendant kills someone with a motor vehicle, it is generally prosecuted as manslaughter rather than first-degree murder.

Even aside from the obvious defects in Daniels' equation of a motor vehicle with a gun, Daniels' argument contains at least two fatal flaws. First, Daniels begs the question of his intoxication. Before intoxication could have negated the possibility of specific intent, the jury would need to have found that Daniels was intoxicated at the time of the killings. The jury heard testimony from two of Daniels' experts relating to his voluntary intoxication argument and was entitled to determine whether or not he was intoxicated as a finding of fact. Because there was no conclusive presumption or preliminary finding that Daniels was intoxicated, we conclude that Daniels has no legal basis for his argument that the State could not constitutionally prosecute him for a crime requiring specific intent.

The second fatal flaw in Daniels' argument is that the State supported its prosecution for first-degree murder with the felony murder rule. Daniels was undisputedly engaged in a robbery when he shot the clerks, and the felony murder rule encompasses killings in the course of a robbery.[3] Robbery is a general intent crime, so Daniels' claimed incapacity to form specific intent would not shield him from culpability for robbery and concomitant culpability for first-degree murder under the felony murder rule. *See* Nevius v. State, 101 Nev. 238, 699 P.2d 1053 (1985) (defendant was not entitled to instruction that voluntary intoxication negated specific intent to kill because robbery invokes the felony murder rule). Accordingly, we conclude that Daniels' arguments on this issue are completely without merit.

*Adequacy of the Marcum notice*

Daniels argues that, because he was not provided with written notice of the State's intent to initiate grand jury proceedings against him, as required by Sheriff v. Marcum, 105 Nev. 824, 783 P.2d 1389 (1989), he was denied the opportunity to testify

---

[3]NRS 200.030(1)(b) defines murder which is "[c]ommitted in the perpetration or attempted perpetration of sexual assault, kidnapping, arson, *robbery,* burglary, invasion of the home, sexual abuse of a child or sexual molestation of a child under the age of 14 years" as murder in the first degree. (Emphasis added.)

before the grand jury on his own behalf. The district court denied Daniels' pre-trial petition for a writ of habeas corpus on this issue, finding that the State met all of the *Marcum* requirements. Because the facts relating to the notice provided are not in dispute, the adequacy of the notice provided is a question of law and, therefore, appropriate for *de novo* review. *See* SIIS v. United Exposition Services Co., 109 Nev. 28, 30, 846 P.2d 294, 295 (1993) (summarizing authority for the conclusion that matters of law are appropriate for *de novo* review).

In *Marcum,* we held that the right of a defendant to testify on his own behalf at a grand jury proceeding prior to his indictment, as provided by NRS 172.095(1)(d) and NRS 172.241, is violated when the prosecution does not provide the defense with "reasonable" notice of the impending proceeding. *Marcum,* 105 Nev. at 827, 783 P.2d at 1391. Upon consideration of the purpose of the *Marcum* notice requirement, which is to provide the defendant with the information necessary to exercise his right to appear at the grand jury proceeding, we recently held that the notice must include the time, place, and date of the grand jury proceeding. Solis-Ramirez v. District Court, 112 Nev. 344, 913 P.2d 1293 (1996).

Daniels does not dispute the State's claim that it provided Daniels' attorney, approximately two weeks in advance, with notice of the time, place, and date of the grand jury proceeding. Daniels' argument focuses on the fact that the notice was given orally, and Daniels contends that written notice is necessary to satisfy the requirements of *Marcum*. Daniels provides no legal authority for this proposition, and it does not comport with Nevada law. This court approved of an orally delivered notice in Johnston v. State, 107 Nev. 944, 822 P.2d 1118 (1991), finding that it was sufficient under *Marcum*.

We conclude that oral delivery of notice to defense counsel does not defeat the purpose of the notice requirement so long as the required information is adequately conveyed. Accordingly, we hold that the district court did not err in finding that the State provided Daniels with adequate notice of the grand jury proceeding and in denying Daniels' pre-trial petition for a writ of habeas corpus on this issue. Having concluded that each of Daniels' arguments is meritless, we affirm the district court's judgment of conviction.