CHARLES LEE RANDOLPH, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 36080

December 14, 2001        36 P.3d 424

[Rehearing denied February 22, 2002]

*Morgan D. Harris* and *Marcus D. Cooper,* Public Defenders, *Curtis S. Brown,* Chief Deputy Public Defender, and *Robert L. Miller,* Deputy Public Defender, Clark County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, and *James Tufteland* and *David T. Wall,* Chief Deputy District Attorneys, Clark County, for Respondent.

## OPINION

*Per Curiam:*

Appellant Charles Lee Randolph robbed and murdered a bartender in Las Vegas in the early morning on May 5, 1998. Randolph was convicted and received a death sentence. Randolph demonstrates error in one of his claims on appeal: the prosecutor mischaracterized the reasonable doubt standard in closing argument. However, we conclude that the error is not reversible and that Randolph's other claims lack merit.

### *FACTS*

On May 5, 1998, John Shivell was working the graveyard shift as a security guard at an apartment complex in Las Vegas. Shivell

was in a guard shack at the gated entrance of the complex. Directly to the west was the parking lot of Doc Holliday's, a bar. Around 1:00 a.m. he heard a sound from the parking lot "like a, a short barking, laugh." Shivell saw two men enter a car and drive out of the parking lot. As the car passed by on the street, he identified it as an older model Cadillac with an opera window. Shivell telephoned Doc Holliday's, but no one answered. He then called the Las Vegas Metropolitan Police Department (LVMPD).

LVMPD officers arrived about ten minutes later and found the bar locked. After the manager of the bar arrived to open the bar, officers entered Doc Holliday's around 2:00 a.m. They discovered the body of Shelly Lokken, the bartender, in the cooler. Lokken's wrists were bound by handcuffs.

Dr. Giles Green performed the autopsy on Lokken's body. Red marks on her wrists indicated that she was still alive when she was handcuffed. She had been shot twice in the head. The first gunshot entered Lokken's right cheek below her eye and exited below her left ear. The shot broke off part of her epiglottis, and she inhaled blood into her lungs. The second gunshot entered the back of her head on the right side and exited above her left eyebrow. This shot was instantaneously fatal.

The blood pooled around Lokken's head and upper body at the crime scene was consistent with her having first been shot while she was upright on her knees. The blood flowed down toward the face from the wound at the back of her head, indicating that she had fallen to the floor by the time of the second shot. A bullet impact site in the concrete floor was consistent with this scenario. Police also found in the cooler a nine-millimeter bullet casing, the copper jacket and lead portion from a spent bullet, and a bullet impact site in the wall.

The bar's cash register was empty of money. The drawer below the register, which served as a gaming bank, was also empty. Inside the office a videocassette recorder (VCR) and multiplexer had been taken from the security surveillance system. The bottom part of a safe in the office was unlocked and open. Lokken had the keys to the safe when she began her shift. Missing from the safe was a green bank bag containing about $3,500.00. A total of $4,629.00 was taken from the bar.

The afternoon following the crimes, police responded to a 911 call from two women at a Las Vegas motel. The women told police that they had spent the night with two men who they thought were involved in the murder at Doc Holliday's. One of the men was still at the motel. Police went to the room occupied by the man, Tyrone Garner, and questioned him. Garner said that he had loaned his car to someone. Police found a set of keys to the car in the room, and Garner gave them permission to take the

keys and search the car if they found it. The car was soon located a few blocks away; it matched the description of the car seen leaving Doc Holliday's early that morning. A VCR and multiplexer were found in its trunk. Police also found a nine-millimeter semi-automatic pistol in the trunk. Testing showed that the pistol had fired the bullet casing and fragments recovered from Doc Holliday's.

A multiplexer takes images from multiple cameras and simultaneously records them on one videotape. The recovered VCR contained a surveillance videotape with input from several cameras at Doc Holliday's. A tape showing the view from each camera in succession was made. The tape was shown to Adell Thompson, among others. Thompson was the general manager of Herman's Barbecue, which operated the kitchen at Doc Holliday's. The tape showed a man whom Thompson identified as appellant Randolph. Randolph had worked at the kitchen for two or three weeks just prior to the crimes.

The doors to the bar were always locked during the graveyard shift at Doc Holliday's. A customer had to press a button to seek entry at the front door, and the bartender could see the customer on a monitor linked to the video surveillance system. The bartender could then decide whether to ''buzz'' a customer in.

The surveillance tape contained about nine minutes of footage relevant to the crimes at Doc Holliday's. Lokken let Randolph into the bar around 12:56 a.m. He entered alone, and the tape showed no one else in the bar except Lokken. Randolph sat down at the bar for a short time, then stood up, reached in his waistband, and pulled out a gun. He climbed over the bar and jumped down in front of Lokken. She raised her arms up, and Randolph moved her out of camera view. The tape did not show Lokken again, but Randolph came in and out of view several times. Around 1:00 a.m., he opened the cash register. A view of the bar also showed occasional flashes of light emanating from beyond the camera view. These flashes were attributable to the opening of the door to the kitchen/office area, which was better lit than the bar, as Randolph went in or out that door. The tape went black just before 1:05 a.m.

Acting on an anonymous tip, LVMPD officers apprehended Randolph on May 8, 1998. As detectives drove Randolph to their office, he asked why he was in custody. The detectives said they were investigating the shooting at Doc Holliday's, and Randolph denied knowing anything about that. When told that he appeared on the surveillance tape, he became quiet and said he would tell the detectives what he knew. At the office, Randolph gave a voluntary recorded statement.

Randolph admitted that he had been on a cocaine binge before the shooting, that he ran out of money and wanted more drugs,

and that Garner drove him to Doc Holliday's so he could steal money to buy more drugs. He admitted that he took money from the safe and the cash register, but said he did not know about Lokken's murder. He claimed that he let Garner into the bar through the backdoor to the kitchen. According to Randolph, Garner wore a mask, had a gun and handcuffs, put the handcuffs on Lokken, and took her to the cooler. Randolph said that he left the building and heard a muffled gunshot and Garner then came out.

Randolph's account was not always coherent or consistent, *e.g.,* he first admitted and later denied having a gun, and he first said he "didn't even hear" and later said he heard a muffled shot. No videotape or physical evidence supported Randolph's claim that Garner was ever inside the bar.

The jury found Randolph guilty of first-degree murder with use of a deadly weapon and four other offenses.

During the penalty phase, the State presented evidence of Randolph's prior criminal history. It also called Lokken's mother and brother, who gave victim impact testimony. Randolph called a forensic psychiatrist, who testified regarding Randolph's personality, abuse that he suffered growing up, his individual and family history of substance abuse, and the effect of his intensive use of crack cocaine. Randolph's wife and stepdaughter testified on his behalf, and Randolph spoke in allocution.

The jurors found three aggravating circumstances, that the murder was committed: during the commission of a burglary, during the commission of a robbery, and to avoid or prevent a lawful arrest. As a mitigating circumstance, they found that Randolph committed the murder while under the influence of extreme mental or emotional disturbance. Finding that the aggravating circumstances outweighed the mitigating, the jurors imposed a sentence of death.[1]

## DISCUSSION

### Instructing the jury on aiding and abetting

Randolph objected unsuccessfully to jury instructions on co-conspirator liability and on accomplice liability for aiding and abetting. He argues that these instructions improperly allowed the prosecution to alter and expand its theory of the case beyond the pleadings of the indictment.

The second amended indictment against Randolph, like the pre-

---

[1]Garner was tried separately, convicted, and sentenced to lengthy terms in prison. *See Garner v. State,* 116 Nev. 770, 6 P.3d 1013 (2000), *cert. denied,* 532 U.S. 929 (2001).

ceding indictments, alleged in Count V that he directly committed murder by shooting Lokken in the head and that Garner aided and abetted in committing the crime. During the guilt phase, Randolph called no witnesses and did not testify. He conceded during argument that he had committed robbery and burglary but argued that Garner had shot Lokken. At the end of the guilt phase, the district court instructed the jury on co-conspirator liability and liability for aiding and abetting. Randolph asserts that he was ready to defend against the State's original, specific allegation that he shot Lokken, but was not prepared to meet a prosecution case based on co-conspirator or accomplice liability.

First, we conclude that the indictment provided Randolph with adequate notice he could be held liable for murder as a co-conspirator. Count I of the indictment alleged that Randolph conspired with Garner to commit robbery and, in furtherance of the conspiracy, committed the acts set forth in Counts II through V. Count V alleged that Randolph murdered Lokken by shooting her in the head and that he and Garner were acting pursuant to a conspiracy to commit robbery. These allegations of conspiracy gave Randolph sufficient notice under NRS 173.075[2] that he had to defend against an alternative theory of co-conspirator liability regardless of the indictment's specific allegation that he killed Lokken directly.

Next, Randolph is correct that the indictment did not charge him with aiding and abetting Garner in the murder of Lokken. Normally, this would preclude the State from gaining instructions and arguing that a defendant is liable as an accomplice. However, we hold that where a defendant raises a defense that implicates a theory of accomplice liability, the prosecution is entitled to jury instructions on aiding and abetting.

In *Barren v. State,* this court held that

> where the prosecution seeks to establish a defendant's guilt on a theory of aiding and abetting, the indictment should specifically allege the defendant aided and abetted, and should provide additional information as to the specific acts

---

[2]NRS 173.075 provides in part:

1. The indictment or the information must be a plain, concise and definite written statement of the essential facts constituting the offense charged. . . .

2. . . . . . It may be alleged in a single count that the means by which the defendant committed the offense are unknown or that he committed it by one or more specified means.

constituting the means of the aiding and abetting so as to afford the defendant adequate notice to prepare his defense.[3]

In *Barren,* the State purposely failed to apprise the defendant of its theory of accomplice liability until the day of trial.[4] Thus, our holding in *Barren* was aimed at preserving due process by preventing the prosecution from concealing or vacillating in its theory of the case to gain an unfair advantage over the defendant.[5] This aim remains valid, but we conclude that it is not implicated here because the record shows that in presenting its case the prosecution did not conceal or vacillate in its theory that Randolph directly committed the murder. It was Randolph who argued that although he was present and participated in the other crimes, he did not kill the victim. In response, the State sought and the district court gave jury instructions on aiding and abetting.

Randolph argues that the State was precluded from the benefit of such instructions because it did not originally charge aiding and abetting. We disagree. Randolph's argument, carried to its logical end, would allow a defendant, in any case where the State did not allege aiding and abetting in the charging document, to escape liability for a crime by proving that he actually aided and abetted the crime. Our holding in *Barren* was not intended to produce such a perverse result.[6] Nor is such a result acceptable under Nevada statutory law: pursuant to NRS 195.020, anyone who aids and abets in the commission of a crime is liable as a principal.

Other Nevada statutes furnish persuasive support for our conclusion that the prosecution was entitled to jury instructions on aiding and abetting. NRS 173.095(1) provides that a district court "may permit an indictment or information to be amended at any time before verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced."[7] And NRS 175.161(1) provides: "Upon the close of the argument, the judge shall charge the jury. . . . If either party requests it, the court must settle and give the instructions to the jury before the argument begins, but this does not prevent the giving of further instructions which may become necessary by reason of the argument."

---

[3]99 Nev. 661, 668, 669 P.2d 725, 729 (1983).

[4]*Id.* at 669, 669 P.2d at 730.

[5]*Id.* at 668, 669 P.2d at 729.

[6]*Cf. State v. Petry,* 273 S.E.2d 346, 349 (W. Va. 1980) ("The ludicrous point of the case before us is that the defendant can successfully defend against an indictment as a perpetrator by proving she was an aider and abettor and vice versa, which is morally absurd.").

[7]*Cf. Koza v. State,* 104 Nev. 262, 264, 756 P.2d 1184, 1186 (1988) ("Where a defendant has not been prejudiced by the charging instrument's inadequacy the conviction will not be reversed.").

Given these statutory provisions and the absence of any unfair concealment or vacillation by the prosecution in presenting its case, we conclude that the district court acted within its discretion in instructing the jury on aiding and abetting. As the Supreme Court of Indiana reasoned in a similar case:

> Appellant now argues that it was improper to give these instructions since the theory of the State's case was that Appellant himself perpetrated these crimes and did not aid or abet anyone else in committing them. He further argues that it was improper for the State to submit these instructions after the close of all of the evidence and that the submission of them at this time amounted to an amendment of the charges against this appellant because the State was, in effect, charging Appellant with a different crime than that with which he had originally been charged. The State properly points out that it was not required to tender final instructions pursuant to [statute] until the close of all of the evidence . . . . Furthermore, the evidence in the cause is one of the elements that determines what instructions are to be given; therefore, final instructions cannot be ultimately resolved until all parties rest on their evidence.
>
> The evidence which tended to show that the appellant himself did not actually commit the murders was introduced by Appellant in an effort to show that he was present and took part in the robbery but did not take part in any killings. The instructions on confederate liability were properly given by the trial court. They do not represent an additional charge nor a new theory in the cause.[8]

We therefore conclude that the district court appropriately gave jury instructions on aiding and abetting in this case.

*The prosecutor's mischaracterization of the reasonable doubt standard*

During the State's rebuttal closing argument in the guilt phase, prosecutor William Kephart made the following remark, with the ensuing objection by the defense and response by the district court.

> MR. KEPHART:   . . . It says here that if your minds, the jurors' minds, after entire comparison and consideration of all of the evidence, are in such a condition that they can say that they feel an abiding conviction of the truth of the charge, there is not reasonable doubt. *You have a gut feeling he's guilty, he's guilty.*

---

[8]*Hoskins v. State,* 441 N.E.2d 419, 424-25 (Ind. 1982).

> MR. BROWN: Objection, judge. I don't think that's an accurate representation of reasonable doubt or—
>
> THE COURT: This is closing argument, but I would instruct, strike the last comment. Let's stay within parameters, please.
>
> MR. BROWN: Judge, could you also admonish—
>
> THE COURT: Counsel, I have given my position. Please sit down.[9]

Later, outside the presence of the jury, defense counsel objected to the court's refusal to admonish the jury:

> Mr. Wall [the prosecutor] objected to a comment that I was making during closing statements that referenced the reasonable doubt, certainly didn't breach the description of reasonable doubt as Mr. Kephart did. And when asked for an admonition, the court gave one. And I asked for an admonition and the court refused.

Defense counsel sought a mistrial, and the district court denied the motion.

The earlier incident referred to by defense counsel occurred as follows.

> MR. BROWN: . . . If Tyrone Garner could have committed this crime, could have under any scenario that you can develop based on the evidence, that's reasonable doubt as to whether Charles Randolph did. Now—
>
> MR. WALL: Judge, just for the record, I'm going to object to that last, as redefining reasonable doubt. Reasonable doubt doesn't say any possible doubt. So, I think that characterization of what reasonable doubt is is incorrect.
>
> THE COURT: As to that, I would just instruct the jury to read for themselves instruction number 48 that defines reasonable doubt.

Randolph argues that prosecutor Kephart's mischaracterization of the reasonable doubt standard constituted reversible error and that the district court erred in not admonishing the jury and in denying the motion for mistrial. We conclude that Kephart's remark was highly improper but did not warrant a mistrial.

This court recognizes that "the reasonable doubt instruction should impress on the jury the need to reach a 'subjective state of near certitude' on the facts in issue."[10] And this court has repeat-

---

[9]Emphasis added.

[10]*McCullough v. State,* 99 Nev. 72, 75, 657 P.2d 1157, 1158 (1983) (quoting *Jackson v. Virginia,* 443 U.S. 307, 315 (1979)).

edly "caution[ed] the prosecutors of this state that they venture into calamitous waters when they attempt to quantify, supplement, or clarify the statutorily prescribed reasonable doubt standard."[11] We have nevertheless consistently deemed incorrect explanations of reasonable doubt to be harmless error as long as the jury instruction correctly defined reasonable doubt. In two cases improper explanations were not harmless because they were combined with erroneous jury instructions on reasonable doubt.[12]

Here, the jury instruction correctly provided the definition of reasonable doubt set forth in NRS 175.211(1), and the district court immediately ordered the incorrect argument stricken. Therefore, consistent with precedent, we conclude that Kephart's improper argument was not prejudicial. Likewise, we conclude that Randolph has not shown that the district court erred in denying the motion for mistrial. Denial of a motion for mistrial is within the district court's sound discretion, and this court will not overturn a denial absent a clear showing of abuse.[13] Because the improper remark does not require reversal, it did not warrant a mistrial.

Two further points need to be made. First, although the district court struck the prosecutor's remark, providing some remedy for the misconduct, we agree with Randolph that the court should have further explicitly admonished the jury that the remark was improper and was to be disregarded. Such an admonishment was in order, however, simply to counter the prosecutor's misconduct, not because of the way the district court handled the State's earlier objection to defense counsel's comments regarding reasonable doubt. The State's objection lacked foundation because those comments were proper: defense counsel simply argued that if the jury could develop a scenario, consistent with the evidence, in which Garner could have committed the murder, it would constitute reasonable doubt. This was not a forbidden attempt to define

[11]*Holmes v. State,* 114 Nev. 1357, 1366, 972 P.2d 337, 343 (1998); *see also Wesley v. State,* 112 Nev. 503, 514, 916 P.2d 793, 801 (1996) ("[W]hen prosecutors attempt to rephrase the reasonable doubt standard, they venture into troubled waters."); *Quillen v. State,* 112 Nev. 1369, 1382-83, 929 P.2d 893, 902 (1996) (warning that analogizing reasonable doubt to the most important decisions in life, like choosing a spouse or buying a house, is improper because such decisions are wholly unlike the one jurors must make in a criminal case); *Lord v. State,* 107 Nev. 28, 35, 806 P.2d 548, 552 (1991) ("Parties to a criminal case should assiduously avoid such attempts to quantify the concept of reasonable doubt.").

[12]*McCullough,* 99 Nev. at 75-76, 657 P.2d at 1158-59; *Holmes,* 114 Nev. at 1366, 972 P.2d at 343.

[13]*Smith v. State,* 110 Nev. 1094, 1102-03, 881 P.2d 649, 654 (1994).

reasonable doubt; it was simply an argument that a certain possibility would meet the standard—which is acceptable, as *Evans v. State* explains:

> We again caution the defense bar and prosecutors alike not to explain, elaborate on, or offer analogies or examples based on the statutory definition of reasonable doubt. Counsel may argue that evidence and theories in the case before the jury either amount to or fall short of that definition—nothing more.[14]

Thus, while the State had every right to argue that the possibility that Garner was the shooter amounted to unreasonable conjecture, not reasonable doubt, it had no sound basis to object to defense counsel's argument. But the district court did not sustain the State's objection or admonish the jury, as Randolph implies. Rather, the court merely directed the jury to follow its instruction defining reasonable doubt.

Second, although we conclude that prosecutor Kephart's misstatement of the reasonable doubt standard does not warrant reversal, the improper remark was particularly reprehensible because this is a capital case and the remark was gratuitous and patently inadequate to convey to the jury its duty to reach a "subjective state of near certitude" to find guilt. Any prosecutor reasonably knows that a "gut feeling" of guilt is not certainty beyond a reasonable doubt and that such an assertion should never be made to a jury. But it is apparent that some prosecutors are not taking to heart this court's repeated admonishments not to supplement or rephrase the definition of reasonable doubt. We can no longer tolerate noncompliance with a simple obligation that helps ensure a fundamental component of this nation's criminal justice system— "the right to a jury verdict of guilt beyond a reasonable doubt."[15] We are convinced that it has become necessary to take specific action to correct this problem, and we will therefore call the prosecutor to account in this case and in future cases where it may arise.[16]

---

[14]117 Nev. 609, 632, 28 P.3d 498, 514 (2001).

[15]*Sullivan v. Louisiana,* 508 U.S. 275, 281 (1993) ("Denial of the right to a jury verdict of guilt beyond a reasonable doubt is certainly [structural error], the jury guarantee being a 'basic protectio[n]' whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function." (quoting *Rose v. Clark,* 478 U.S. 570, 577 (1986))).

[16]We are issuing, contemporaneously with this opinion, an order to attorney Kephart to show cause why this court should not impose on him sanctions such as, but not limited to, a monetary fine or referral to the State Bar of Nevada for violation of the Rules of Professional Conduct.

*The prosecutor's characterization of evidence during closing argument*

Randolph contends that the district court erred in denying his motion for mistrial based on the prosecutor's characterization of evidence in closing argument during the guilt phase. Randolph claims that the prosecutor misrepresented the testimony of John Shivell, the security guard at the apartment complex by Doc Holliday's.

Shivell testified that he heard a sound from the bar's parking lot: "At the time it sounded like a, a short barking, laugh, you know, like a, (witness demonstrating), you know, something of that sort." He then saw two men enter a car and drive out of the parking lot. On cross-examination, the following exchange occurred.

> Q  [Y]ou heard a noise. You indicated . . . that you think it may have been, you demonstrated a quick cackle, or you're not sure?
> A  Well, I don't know how to repeat it.
> Q  Sure.
> A  It's, what it sounded like was just like a barking, a bark, a laughter but very short.
>  . . .
> Q  Could that noise have been a trunk or a door closing possibly?
> A  I, I don't know if I can stretch it that way, you know. I don't know. Get the proper trunk, the proper metal to metal or whatever, possibly.
> Q  Okay. Possibly? Certainly you couldn't characterize it as laughter?
> A  No. No, not, it wasn't laughter.
> Q  I just wanted to clear that up.
> A  In that sense.

At the end of his closing argument, prosecutor Kephart referred to Shivell's testimony:

> [W]hat drew his attention to what was happening at the bar was a shrieking kind of laugh. Do you recall that? And he looked over, and he saw two individuals getting into a car. Tyrone Garner's waiting for his accomplice to leave this bar. Out comes the defendant carrying a VCR and multiplexer, money. And he greets him, and there's a joy, joy for the fact that the loot, in the defendant's words, was had, joy, ladies and gentlemen. Shelly Lokken is dead, and what drew this man's attention was laughter. Thank you.

Randolph argues that the cross-examination of Shivell made it unambiguously clear that the sound he heard "was definitely not laughter." We disagree. Randolph focuses solely on Shivell's words, "No. No, not, it wasn't laughter," but Shivell immediately added, "In that sense." We conclude that the prosecutor was entitled to rely on Shivell's other references to hearing "a short barking, laugh" and "a bark, a laughter but very short" and to argue that Shivell heard laughter. The State is free to comment on testimony, to express its views on what the evidence shows, and to ask the jury to draw reasonable inferences from the evidence.[17] The jury was also instructed that "[s]tatements, arguments and opinions of counsel are not evidence in the case" and was told that its recollection of the evidence was determinative.

The district court acted within its discretion in denying the motion for mistrial.[18]

### The district court's dealings with defense counsel

Randolph also sought a mistrial based on alleged misconduct by the district court. During the prosecutor's rebuttal closing argument in the guilt phase, defense counsel Curtis Brown raised three objections. The first, discussed above, was to the prosecutor's assertion that a "gut feeling" of guilt was sufficient to satisfy the reasonable doubt standard. After the district court struck the comment, the court abruptly rejected defense counsel's request for an admonition. The second objection and the court's response are not at issue. Defense counsel's third objection was to the prosecutor's description of certain evidence. The court responded that it was up to the jury to decide and called for no more interruptions. When counsel asked if the court was limiting him, the court said, "I'm limiting you at this time, Mr. Brown. So, please do not provoke the court any further."

Randolph argues that the district court's conduct placed his counsel in a bad light in front of the jury and deprived him of a fair trial because it gave the jury the impression that his counsel's objections were inappropriate and unreasonable. It appears that the relation between the district court and counsel became somewhat confrontational, and the court let its annoyance and impatience show in front of the jury. Judges must be mindful of the influence they wield.[19] The words of a trial judge may mold the

[17]*Bridges v. State,* 116 Nev. 752, 762, 6 P.3d 1000, 1008 (2000).

[18]*Smith,* 110 Nev. at 1102-03, 881 P.2d at 654 (stating that this court will not overturn denial of a motion for mistrial absent a clear showing of abuse of discretion).

[19]*Oade v. State,* 114 Nev. 619, 621, 960 P.2d 336, 338 (1998).

opinion of the jurors to the extent that a party may be prejudiced.[20] For example, in *Oade v. State* we concluded that the trial court's repeated expressions of impatience with defense counsel throughout the trial in the presence of the jury may have had an adverse impact on the jury's impression of defense counsel and thus may have adversely affected the jury's acceptance of the defense case.[21]

Here, the district court's expressions of annoyance with defense counsel in front of the jury numbered only two and were not extreme. We conclude that they did not prejudice Randolph's defense and were not grounds for a mistrial.

*Display of emotion by members of the victim's family during the State's closing argument*

Randolph contends that the district court erred in not granting a mistrial based on a display of emotion by members of the victim's family during the State's initial closing argument in the guilt phase. Alternatively, he argues that the court erred in not holding an evidentiary hearing to determine how the jury was affected. Randolph cites as authority the general proposition that a defendant is entitled to a panel of impartial jurors.[22] First, Randolph did not request an evidentiary hearing below. There is no plain error in this regard; therefore, we decline to address this issue.[23] Second, our review of the record does not reveal that the incident in question unduly influenced the jury, and we conclude that the district court acted within its discretion in denying the motion for mistrial.

*Rejection of appellant's proposed jury instruction defining deliberation*

The jury in this case received the *Kazalyn* instruction on premeditation and deliberation, which this court abandoned in *Byford v. State*.[24] Defense counsel proffered an instruction defining "deliberate," and the district court refused it. Citing *Byford,* Randolph claims that the refusal of his instruction constitutes

---

[20]*Id.* at 623, 960 P.2d at 339.

[21]*Id.*

[22]*See, e.g., Bishop v. State,* 92 Nev. 510, 515, 554 P.2d 266, 269 (1976).

[23]*See* NRS 178.602 ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

[24]116 Nev. 215, 994 P.2d 700, *cert. denied,* 531 U.S. 1016 (2000).

reversible error. We have held that "with convictions predating *Byford,* neither the use of the *Kazalyn* instruction nor the failure to give instructions equivalent to those set forth in *Byford* provides grounds for relief."[25] *Byford* was decided on February 28, 2000. Although Randolph's judgment of conviction was entered on April 14, 2000, the jury found him guilty on January 24, 2000. Therefore, this claim warrants no relief.

We note that the proof here that the murder was deliberate and premeditated is strong: the evidence shows that Randolph planned the burglary and robbery; in carrying out those crimes, he forced Lokken into the cooler, put handcuffs on her, and then, while she was helpless, shot her in the head twice. Although the jury found that he committed the murder under the influence of extreme mental or emotional disturbance, evidently because of his cocaine addiction, the evidence amply supports a finding that Randolph determined to kill Lokken as a result of thought, including weighing the reasons for and against his action and considering its consequences, and that the murder was not the result of a mere unconsidered and rash impulse.[26] Furthermore, the evidence of first-degree felony murder is indisputable.

*Rejection of appellant's proposed jury instruction on the failure to gather evidence*

At trial Randolph proposed a jury instruction stating that because the State failed to seize and test brown clothing worn by Garner on the night of the crimes "for the existence of blood evidence, the clothing is irrebuttably presumed to ha[ve] contained blood evidence." The district court rejected the instruction. Randolph contends that this was reversible error.

The following facts are relevant. A witness testified that early in the morning on May 5, 1998, Randolph and Garner returned to a trailer where the two had been earlier in the evening smoking crack cocaine. The trailer was a location where people regularly came to use cocaine. Upon his return, Garner changed out of a brown shirt and brown pants and put on a green shirt and green pants. After Garner's arrest, the green shirt and pants were impounded at the city jail and later tested for the presence of blood. The test was negative. Garner's shoes were not impounded or tested. Although investigators were aware that Garner had changed out of brown clothes after the crimes, they never searched for the clothes. The trunk of Garner's car contained a pile of clothing, but investigators did not look through the clothing to see if it included the brown shirt and pants.

---

[25]*Garner,* 116 Nev. at 789, 6 P.3d at 1025.

[26]*See Byford,* 116 Nev. at 236, 994 P.2d at 714.

Randolph asserts that the State failed to gather potentially exculpatory evidence because a finding of blood on Garner's clothing or shoes would have supported Randolph's defense that Garner was the shooter. He argues that he therefore had a right to the proposed jury instruction. If the evidence was material and the police acted out of gross negligence or bad faith in not preserving it, Randolph had a right to an instruction that the ungathered evidence was presumed to be unfavorable to the State.[27]

In a criminal investigation, police officers generally have no duty to collect all potential evidence.[28] However, in some cases a failure to gather evidence may warrant sanctions against the State. The defense must first show that the evidence was material, *i.e.,* that there is a reasonable probability that the result of the proceedings would have been different if the evidence had been available.[29] Second, if the evidence was material, the court must determine whether the failure to gather it resulted from negligence, gross negligence, or bad faith.[30] In the case of mere negligence, no sanctions are imposed, but the defendant can examine the State's witnesses about the investigative deficiencies; in the case of gross negligence, the defense is entitled to a presumption that the evidence would have been unfavorable to the State; and in the case of bad faith, depending on the case as a whole, dismissal of the charges may be warranted.[31]

The State argues that evidence that Garner shot Lokken would be immaterial because Randolph would still be liable for first-degree felony murder. But this argument overlooks that such evidence would remain material for determining Randolph's proper sentence.

Nevertheless, we conclude that Randolph has not shown that the ungathered evidence was material. If testing of Garner's clothing or shoes had revealed the victim's blood, it is possible that Randolph might not have received a death sentence. However, Randolph has not demonstrated a reasonable probability that such testing would have revealed any blood. He offers no evidence to corroborate his allegation that Garner was the shooter. The possibility that testing Garner's clothing and shoes would have been favorable to his case remains mere speculation.

Even assuming the evidence was material, the failure to collect

---

[27]*See Daniels v. State,* 114 Nev. 261, 267, 956 P.2d 111, 115 (1998).

[28]*Id.* at 268, 956 P.2d at 115.

[29]*Id.* at 267, 956 P.2d at 115.

[30]*Id.*

[31]*Id.*

it was at worst negligent. First, Randolph has not shown that police could have collected the brown shirt and pants. He simply assumes that a search of the trailer or the clothing in the trunk of Garner's car would have uncovered them. Second, Randolph has not shown that the potential evidentiary significance of Garner's shoes, which were available to police, was so obvious that it was gross negligence not to impound and test them. Thus, assuming the evidence was material and police were negligent in not gathering it, Randolph's remedy was to examine witnesses regarding the deficiency of the investigation. The record shows that he did so.

The district court did not err in refusing to give the proposed instruction.

*Denial of appellant's motion to bar the admission of victim impact evidence*

Randolph claims that the district court deprived him of a fair trial by denying his motion to bar the admission of victim impact evidence by Lokken's mother because it was unduly inflammatory. Victim impact testimony is permitted at a capital penalty proceeding under NRS 175.552(3) and under federal due process standards, but it must be excluded if it renders the proceeding fundamentally unfair.[32] Admissibility of testimony during the penalty phase of a capital trial is a question within the district court's discretion, and this court reviews only for an abuse of discretion.[33] Our review of the testimony at issue reveals nothing that rendered the penalty phase fundamentally unfair. The district court acted within its discretion in denying the motion and admitting the testimony.

*The district court's communication with a juror without notifying counsel*

Randolph claims that the district court's communication with a juror without the presence or knowledge of the parties was prejudicial error.

Early in the afternoon on the second day of jury deliberations in the penalty phase, after being informed that a juror had taken ill, the district court sent the jury home for the afternoon and so informed the parties. The jury returned the next morning and reached a unanimous verdict of death just before noon. After dismissing the jury, the district court stated:

---

[32]*Leonard v. State,* 114 Nev. 1196, 1214, 969 P.2d 288, 300 (1998) (citing *Payne v. Tennessee,* 501 U.S. 808 (1991)).

[33]*Rippo v. State,* 113 Nev. 1239, 1261, 946 P.2d 1017, 1031 (1997).

[Y]esterday at one o'clock the court was informed that [one juror] . . . had a bout—was a little sick with anxiety yesterday. The court talked to him in chambers, asked as to his ability to go forward or whether or not he felt he could not go forward. He indicated to the court that after some rest, he wanted to go forward with participating in this jury verdict. So at that time the court informed the bailiff who informed our jurors that they were excused for the day . . . and that they would reconvene the [next] day.

[The juror] reported this morning and was able to go forward.

One week later, defense counsel filed a motion for a new trial or a new penalty hearing based on the court's ex parte communication with the juror. The court heard argument on the motion. Defense counsel informed the court that he had spoken to the juror after the trial and that the juror revealed he was under a doctor's care and taking a prescribed medication for panic attacks. The court denied Randolph's motion. The court explained that it considered the situation to be one involving a sick juror who needed to be sent home. The court did not inquire into the jury's deliberations: "The conversation with [the juror] was very curt, very limited, just as to his ability to go forward, if he was interested in going forward." The court saw nothing that indicated any bias or lack of competence on the part of the juror.

Randolph argues that the district court should have informed his counsel "that a juror was suffering from a medicated psychological disorder which was severe enough to prevent him from deliberating. With disclosure to all counsel a full evaluation and fair consideration of this juror's ability to deliberate could have been reviewed and if necessary corrective measures taken."

In *Rushen v. Spain,* the United States Supreme Court stated that "the right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant."[34] In some cases contact between a judge and juror can violate these rights.[35] Under the circumstances of this case, we conclude that no such violation occurred. Randolph raises only the possibility that the lack of disclosure might have prejudiced him in some indefinite way. In *Rushen,* the Court observed that the "*ex parte* communication [between the judge and a juror] was innocuous. They did not discuss any fact in controversy or any law

[34]464 U.S. 114, 117 (1983).

[35]*See id.* at 117-21.

applicable to the case. . . . Thus, the state courts had convincing evidence that the jury's deliberations, as a whole, were not biased by the undisclosed communication . . . ."[36] We conclude that these observations are germane to this case as well and that the record supports the district court's finding that Randolph was not prejudiced by the undisclosed communication with the juror.

### Mandatory review of the death sentence

NRS 177.055(2) requires this court to review every death sentence and consider in addition to any issues raised on appeal:

> (b) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
> (c) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
> (d) Whether the sentence of death is excessive, considering both the crime and the defendant.

The jurors found three aggravating circumstances, that the murder was committed: during the commission of a burglary, during the commission of a robbery, and to avoid or prevent a lawful arrest. As a mitigating circumstance, they found that Randolph committed the murder while under the influence of extreme mental or emotional disturbance.

The evidence in this case supports the finding of all three aggravators. The circumstances involving burglary and robbery are indisputable, and Randolph's obvious motive for shooting Lokken was so that she could not identify him and aid police in arresting him. We discern no evidence that the sentence was imposed under the influence of passion, prejudice, or any arbitrary factor; nor was the mitigating evidence weighty. Considering the crime and the defendant, we conclude that the sentence of death is not excessive.

### CONCLUSION

None of Randolph's assignments of error warrants relief. We therefore affirm his judgment of conviction and sentence.

---

[36]*Id.* at 121.